# Dunn *against* the State.

## Appeal *from Phillips Circuit Court.*

Testimony of a person's guilt, or participation in the commission of a crime, or felony, wholly unconnected with that for which he is put upon his trial, cannot, as a general rule, be admitted.

But where the *scienter* or *quo animo*, is requisie to, and constitutes a necessary and essential part of the crime with which the person is charged ; and proof of such guilty knowledge, or malicious intention, is indispensable to establish his guilt, in regard to the transaction in question, testimony of such acts, conduct, or declarations of the accused, as tend to establish such knowledge or interest, is competent; notwithstanding they may constitute in law a distinct crime.

But proof of a distinct murder, committed by the prisoner at a different time, or of some other felony or transaction committed upon or against a different person, and at a different time, in which the prisoner participated, cannot be admitted, until proof has been given, establishing, or *tending to establish the offence with which he is charged* and showing some connection between the different transactions ; or such facts and circumstances as will warrant a presumption that the latter grew out of, and was to *some extent induced by some circumstance connected with the former*; in which case, such circumstances connected with the former, as are calculated to show the *quo animo* or motive by which the prisoner was actuated or influenced in regard to the subsequent transaction, are competent and legitimate testimony.

The only satisfactory principle upon which the *dying declarations* of a person deceased can be admitted to establish the circumstances of his death, is, that they were made at a time when, in the mind of the deceased all expectation of recovery was yielded up, and supplanted by the conviction that he would certainly die by reason of the injury received, and under which he than languished.

When every hope of this world is gone : when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth, a situation so solemn and awful is considered by the law as creating an obligation equal to that which is imposed by an oath administered in court.

That such declarations were made under an apprehension *of impending death*, may be collected from the nature and circumstances of the case, although the declarant did not express such an apprehension.

Nor is it essential that the party should apprehend *immediate dissolution. It is suffi*-cient if he apprehends it to be impending and certain; and this is always a question for the court to determine, upon consideration of all the surrounding circumstances.

The *deposition of a witness*, concerning a killing, taken under our statute before the Coroner, reduced to writing, subscribed by the person examined, and attested by the Coroner, and by him returned to the Circuit Court with the inquest, is a written document, which by authority of law, is constituted the authentic and appropriate instrument of evidence, of what the witness then stated ; and the deposition itself being in evidence and attainable, being in court, in the hands of the Attorney of the State, oral evidence of the contents thereof could not legally be admitted on the part of the prosecution in a trial of such witness for the murder.

Moreover, by the statute, the evidence so taken before the Coroner, cannot be used against the person giving it, in a subsequent prosecution for the same killing : and therefore, neither the deposition of the defendant in this case, taken before the Coroner, nor oral testimony of its contents, could be used against him.

In appeal or writ of error, in criminal cases, the statute requires the Supreme Court to consider the whole record, (no assignment of errors being necessary,) and *to render* such judgment thereon as may appear to be authorized by law.

All courts, unless restrained by some statutory provision, have the right of adjourning their sittings to a distant day ; and the proceedings had at the adjourned session, will be considered as the proceedings of the term so adjourned.

The Circuit Courts, in this State, as contra-distinguished from the Judges, have, unalterably, by the Constitution, the exclusive original judicial cognizance of all crimes amounting to felony at the common law.

No judicial power whatever is conferred by the Constitution upon the Judge, as contra-distinguished from the court, unless he can derive it from the power with which he is clothed as a conservator of the peace, or of adjudicating certain cases upon habeas corpus.

To constitute a court, there must be a place appointed by law for the administration of justice ; and some person authorized by law to administer justice at that place, must be there for that purpose.

And if the law prescribed no time for holding the court, the Judge might lawfully hold it when, and as often as he chose.   So if the place were left to his election, instead of being fixed and prescribed by law, he might lawfully sit in judgment where he pleased, within the Territorial limits prescribed to his jurisdiction.

But in this State, both the time and place of holding the terms of the Circuit Court, in each county are prescribed by law ; and in many counties the duration of the terms limited to a single week.

Under particular circumstances, a special term of any Circuit Court may be held for the trial of persons confined in jail, upon the Judge making out a written order to that effect, and transmitting it to the clerk, who is to enter it on the records of the court, and notify the Prosecuting Attorney.

The authority to hold such special term depends upon the following facts and circumstances:—*First.* That some person is confined in jail, who may be lawfully tried upon some criminal charge.   *Second.* That it shall not interfere with any other court to be held by the same Judge.   *Third.* That it shall not be held within twenty days of the regular term of such court.   *Fourth.* That an order therefor be made out by the Judge and by him transmitted to the Clerk.   *Fifth.* That the same be entered on the records of the court.

And the power to hold a special term, being a special power, every circumstance necessary to its exercise, must exist, and be made to appear of record ; otherwise the power cannot appear to have been legally exercised.

The power of the court, at such special term, is confined to the trial of the persons confined in jail when the order was made, which must be at least ten days before the term ; and no other persons can be tried at such term.

The order for a special term must therefore be made at least ten days before the commencement of the term, must designate the persons to be tried, state that they are confined in jail, and whether they have been indicted or not; and if they, or either of them, have not been indicted, must contain a direction to the Clerk to issue a *venire* for a grand jury ; and such order must be transmitted to the Clerk, and by him entered on the record of the court.

When this is done, if the time fixed in the order for the special term, interfere with no other court to be held by the same judge ; and is not within twenty days of the regular term ; and if then the record further shows that the Judge, authorized by law to hold such court, was present at the time fixed in the order, and at the place prescribed by law for holding such court, the court will be legally constituted ; and in regard to such persons as are confined in jail and designated in the order, may exercise judicial power.

And where a special term is held, without any such order being entered upon the record, the proceedings at such term must be considered as proceedings before the Judge simply, as contra-distinguished from the court ; and cannot be regarded as the judicial proceedings and adjudications of the Circuit Court.

Such proceedings, therefore, are *coram non judice* and void ; and the life of the person so convicted cannot be considered as having been, in contemplation of law, once put in jeopardy; and he may yet be lawfully tried as if no such proceeding had ever taken place.

The appellate jurisdiction of the Supreme Court of this State, under the Constitution does not, nor can it be made to, extend to the proceedings or decision of any officer or tribunal whatever, other than the *judicial* proceedings or determinations of some court or Justice of the Peace, vested under the Constitution with some portion of judicial power.

Dunn *against* the State.

And the proceedings at the special term being *coram non judice*, the Supreme Court has no appellate jurisdiction of the case; and it will be dismissed; and a perpetual supersedeas awarded to all proceedings had at the special term in the case.

By an indictment of the grand jury of Phillips county, returned to and filed in the Circuit Court of said county on the 11th day of May, at the regular term thereof, held in May, 1839, the appellant was charged as accessory before the fact, to the murder of *John Williams*, thereby charged as having been committed in said county, on the 9th day of January, 1839, by *William Broadus* and *John Lucas*, who are also charged and indicted by said grand jury in the same bill as the principals in said murder. After said indictment was brought into court by the grand jury, a writ of capias ad respondendum founded thereon was issued out of said court against the said *Broadus*, *Lucas*, and *Dunn*, addressed to the Sheriff of said county, and made returnable to said county on the first Monday in November, 1839, by virtue of which the Sheriff on the 12th day of May, arrested and took into his custody the body of said appellant, and committed him to the jail of said county. After setting forth the facts above stated, the transcript of the record, contains the following statement, viz: " And at a special term of the Circuit Court, began and held at Helena, within and for the county of Phillips, in the State of Arkansas, on the 12th day of August, A. D. 1839, before the Hon. *John C. P. Tolleson*, J., the following proceedings were had in the case of the *State of Arkansas vs. Hiram Dunn*, who was indicted as an accessory before the fact, to the murder of *John Williams*." The record then states that the appellant on the 13th day of August, 1839, was brought into said court, in the custody of the Sheriff, and arraigned on said indictment, " whereupon said defendant waived his right to a service of a copy of said indictment, and consented to plead forthwith to the same, and thereupon he pleaded that he was not guilty, in manner and form, as was charged in said bill of indictment, for his trial put himself upon the country, and the Attorney prosecuting for the State doth the like." The court then awarded a *venire facias* for thirty-eight good and lawful men, from whom to select a jury in this behalf, and directed the same to be made returnable at nine o'clock the next morning, which was accordingly returned into court the next day, " and the said defendant having waived all right to a service of a copy of said panel

consented to proceed forthwith with the selection of a jury in this behalf"—the record then shows that nine jurors were selected from said panel when the same being exhausted, " the court, by the consent of the defendant, ordered the Sheriff to summon others from among the by-standers, of whom three others were chosen jurors, making, as the record states, " twelve good and lawful men of the county of Phillips, who being first sworn well and truly to try the issue joined, and a true verdict to render, according to evidence, were, by consent of parties, committed to the charge of the Sheriff, by him to be kept separate and apart from all persons, and to be brought back into court" the next day at eight o'clock. The record then shows that the jury was brought into court on the next day, and the trial proceeded in, and continued from day to day until the 16th day of August, when it closed, and the jury returned into court their verdict, as follows, " we, the jury, find the defendant, *Hiram Dunn*, guilty in manner and form as charged in the bill of indictment. Signed, *Uriah A. Clary*, foreman;" which was entered of record in the language above stated, and on the next day the defendant moved the court for a new trial, but his motion was overruled, and he excepted to the opinion and decision of the court refusing to grant him a new trial, and tendered his bill of exceptions, which was signed and sealed by the court, and made a part of the record. The record then states, " and thereupon the said Hiram Dunn being called upon to declare what he had to say why the judgment of the law should not be pronounced upon him, responded nothing in bar thereof, whereupon it is considered by the court that the said Hiram Dunn be taken back to the common jail of the county from whence he came, there to remain until the thirteenth day of September next, and from thence to the place of public execution, and between the hours of 10 o'clock of the forenoon, and 3 o'clock of the afternoon, of the thirteenth day of September, that he be hung by the neck until he dead."

From this sentence the defendant on the 17th day of the same month prayed an appeal to the Supreme Court, which was granted; but the court refused to stay the execution of the sentence, and ordered a warrant to be made out to the Sheriff of Phillips county, commanding him to execute the sentence previously pronounced

Dunn *against* the State.

against the defendant, which was subsequently stayed by the order of one of the Judges of the Supreme Court, made upon inspection of a transcript of the record; and hearing the application therefor made on behalf of said Dunn, after a due consideration thereof. The bill of exceptions of the defendants taken to the opinion and decision of the court annulling his motion and refusing to grant him a new trial, contains a statement of all the testimony given on the trial.

The appellant on the trial and argument of this case before this court, rested his objections to the judgment against him on three exceptions only—

*First.* That the court erred in admitting evidence of a distinct felony to go to the jury on the trial of the cause.

*Second.* That the court erred in rejecting and excluding from the jury testimony of the declaration of the deceased Williams that "he had been shot by mistake," when the same ought to have been admitted as his dying declaration.

*Third.* That the court erred in admitting the parol testimony of the Coroner, to prove the statements made by the appellant Dunn, in giving his testimony before said Coroner on the inquest held by him over the body of the deceased, to whose murder he stands here indicted, as accessory, the said testimony of the appellant having been taken on oath, reduced to writing, subscribed by him and certified by the Coroner.

McPHERSON, for the appellant:

There are three grounds upon which the appellant relies for a reversal of the judgment in this cause. The first that I shall review is " that the court below erred in admitting evidence of a distinct felony, (the shooting of Earnest,) to go to the jury on the trial of the cause."

" No evidence can be admitted which does not tend to prove, or disprove the issue joined." 2 *Russell*, 647. And the same writer urges that the reason and necessity exists much stronger in criminal than in civil cases for the observance of this rule, and of confining the evidence *strictly* to the issue, for the indictment is all that the defendant is expected to come prepared to answer. *Starkie*, and other

elementary writers, maintain the same doctrine, that the defendant can only be tried upon the charges laid in the indictment, and as he is not expected to come prepared to make his defence against the charge of another and separate crime, therefore, the introduction of extraneous evidence is calculated to take the defendant by surprise, and do him manifest injustice, by creating a prejudice against the defendant's general character.

Where several different felonies are alleged in the same indictment, or the evidence appears to refer to more than one distinct unconnected felony, it is usual for the Judge, in his discretion, to call upon the counsel for the prosecution to select one felony, and to confine the evidence to that particular charge.   2 *Russell*, 649; *Rex vs. Jones*, 3 *Camp.* 132.

" Generally speaking, it is not competent to a prosecution to prove a man guilty of one felony by proving him guilty of another unconnected felony." 2 *Russell* 649; 1 *Leigh*, 574, *Walker vs. Commonwealth*.   In connection with the last authority in *Russell*, the learned author goes on to say upon the other hand, " but when several felonies are connected together, and form part of one entire transaction, then the one is evidence to show the character of the other," and cites the case of *Rex vs. Ellis*, 13 *C. L. R.* 123, as an example to which case we will again refer.   In the case of *Rex vs. Smith*, 12 *C. L. Rep.* 295, indicted for forgery, the prosecution *offered to* introduce proof of another uttering of a forged note, to show the prisoner's *guilty* knowledge, but as that uttering had been made the subject of another indictment, the court refused to receive it in evidence, and observed "that although other utterings for which no prosecution had been commenced, have been held to be evidence to show a guilty knowledge, yet, where it is the subject of a substantive charge, it could not be admitted," and the learned Judge observes " that it had been questioned by many able lawyers whether it could be admitted under any circumstances."

The contrary doctrine contended for, relies for support upon the case of *Rex vs. Hough*, 1 *E. C. C.* 120, where upon an indictment for forgery, other forged bills upon the *same house*, which were found upon the prisoner at the time of his apprehension, were admitted as evi-

dence to show his guilty knowledge; and in the case of *Rex vs. Ball*, 1 *Eng. C. C.* 132, upon a trial for forgery, other forgeries were admitted to show from corresponding circumstances the guilty knowledge of the defendant, and the same doctrine is laid down in many of the reported English cases. But upon examination, it will be found that the evidence was admitted in cases where it was necessary to establish the guilty knowledge of the defendants, to show that it was not through ignorance or mistake. That the evidence has generally applied to cases of *forgery* and *counterfeiting* where other acts of forgery, or the possession of other spurious coin, were facts that plainly showed the guilty knowledge of the defendants.

In the case of *Rex vs. Ellis*, 13 *C. L. R.* 123, as referred to in *Russell* as an illustration, was where the prisoner was employed as a Clerk, and as opportunity offered, in going to the drawer for change, purloined different pieces of money, and upon an indictment for the theft of one of the pieces so stolen, the continuous takings of all the peices were permitted to go in evidence, as it went to show that the one piece was not taken by accident or mistake. In the case of *Rex vs. Vake*, 1 *E. C. C.* 531, evidence of the prisoner having shot at the prosecutor about a quarter of an hour before the time of the shooting charged, was admitted in evidence to show the malice of the defendant. In *Philips' Evidence* it is laid down " that the declarations of a prisoner, made at a former time, are admissible where they tend to prove the intent of the party at the time of the commission of the offence," and gives as an illustration " that on an indictment for murder, evidence of former *grudges* and antecedent menaces may be given to show the prisoner's *malice* against the deceased." *Roscoe C. Ev.* 71.

Dunn stands indicted as accessory to the murder of John Williams. This crime must originate in *malice* towards the deceased, and malice towards Earnest could not be evidence of the malicious intent towards the deceased. It is true that there are some cases laid down in the books, of persons manifesting a general malice towards all mankind, as where a man shoots into a crowd, or throws a timber from a building into a crowded street, without giving warning to the passers by.

This case is not of that kind; from the evidence embraced in the record, it evidently appears that if guilty, the defendant must be

guilty with malice aforethought towards the deceased, and the malice of the defendant towards Earnest would be no evidence of malice towards the deceased, who was not present or concerned in the first shooting, if the same took place, and the introduction of such evidence was only calculated to create a prejudice against the defendant, which he cannot be expected prepared to answer. But even in cases where such evidence *is* admissible, what the prisoner said in regard to a collateral matter cannot be given in evidence against him, " as it was impossible that the prisoner could be prepared to contradict it." *Phillips' case, Lewin C. C. 105; Ros. C. E. 69.* In the present case the only evidence of the defendant's connexion with the first and distinct felony is the overheard conversation proved to have been held with his wife. Strip it of Dunn's conversation, and there is no other evidence to sustain or prove his connexion with the former and separate felony.

The next point relied upon is that the court excluded Williams' declaration that he " had been shot by mistake," which should have gone to the jury as a dying declaration. There are numerous English decisions in regard to dying declarations, and there appears to be some conflict of opinion upon the subject. Where there has been sufficient evidence *without*, the courts appear to have been very cautious in admitting dying declarations, which were always offered in evidence against the prisoner. But where it became necessary to use them they seem in many instances to have relaxed the rule. The numerous decisions are cited in 1 *East*, 353 to 359, and the doctrine appears to have been fully discussed and settled in *Woodcock's case*, 1 *Leach*, 500, and in *Dingler's case*, 1 *Leach*, 504; and from these cases it appears to be the settled doctrine that where the party is *in extremis* at the time his declarations are admissible, and it is not necessary that he should express his apprehension of death, or that he be apprised of his danger, if the circumstances go to show that he was dying or must die, The admissibility of such testimony is to be determined by the court, the *weight* of such testimony is to be left to the jury. The question arises whether the circumstances were sufficient to show that the deceased was *in extremis*, when he made the declaration " that he had been shot by mistake." If they were, the court

below erred in excluding it from the jury. Before the question was asked, in regard to the declarations of the deceased, it had been detailed in evidence by "Nally," that the deceased had complained of being very *sick.* That he had offered any one $150, that would take him in a boat down to Dodge's, who lived one and a half miles below; that the witness was present at the Coroner's inquest, and saw two bullet holes in the back of the deceased, one of which the ball had ranged forward through the bowels and lodged against the skin, where it was cut out. Upon an examination of medical authorities, it will be found that when thus wounded it was impossible that he should *live* any length of time. That he did die shortly after appears from the evidence, and that he died of the wounds received there can be no doubt. In the case of *Rex vs. Moseley, and another,* " the declarations of the deceased, made on the day he was wounded, and when he believed he should not recover, held admissible, though he did not die until *eleven* days afterwards, and though the surgeon did not not think his case hopeless, and continued to tell him so until the time of his death."

The objection that has generally been made " that the defendant was deprived of the opportunity and advantage of cross examination does not apply to this case," as here it but goes to carry out the benign principle of the law, to administer *justice* in *mercy.*

The third and last point upon which I rely is that the evidence of Skinner was admitted, which was but secondary, and not the best which the party had it in their power to produce.

The nature and object of evidence is fully explained, and the general rule laid down in 1 *Starkie,* 102, 103, *Randall's Peake,* 10, 11, 13, taking the record as it is, and it appears that the prosecution offered in evidence the affidavit of Dunn, taken before the Coroner, and it being objected to, they then called Joshua Skinner, the Coroner, who proved, &c., &c. Now all the authors upon evidence, lay it down as the doctrine that where a party offers to introduce testimony and then withdraw it and offer secondary testimony instead, it raises the presumption that the first and last evidence, if introduced, would make against the party offering it, and therefore he will not be allowed to use inferior testimony instead. And the advantages of

written testimony over *parol* are forcibly and clearly pointed out in 2 *Hawkins*, 596, *sec.* 41; and the cases in which written evidence is the highest and best, are noticed in 3 *Starkie*, 1042. By the law then in force, *Steele's Dig.* 305, the Coroner is required upon the examination of dead bodies, to take depositions and return them to court. This requisition is similar to that of the statute of *Phillip and Mary*, 2 *Russell*, 606, and although the English statute does not in express terms make the depositions so taken, evidence in court, yet the law requiring them to be taken and *returned* to court, they become so, under the general rule that requires the best evidence to be given. See *Rex vs. Smith*, 3 *Com. L. R.* 318. It further has been decided in the case of *Rex vs. Tubby*, 24 *Com. L. R.* 441, " that the affidavit of a person not at the time under suspicion, is admissible in evidence against him if he be afterwards charged with the commission of the offence." Whether we look then to the manifest spirit and intention of the statute requiring the depositions to be returned to court, or to principle, settled in *Tubby's case*, still his deposition was good evidence against him. If so, it was the best evidence, and could not be superseded by parol. See *Fearshire's case*, 1 *Leach*, 202; 2 *Rus.* 623. But it may be asked were the facts contained in the affidavit material to the issue? We answer that it was, or at least became so after the introduction of it by the prosecution. The general rule of law makes the *whole* statement or affidavit of Dunn evidence when introduced by the prosecution. In the affidavit of Dunn he states that he knew nothing of the murder of Williams; which, if true, exonerates him from all guilt, and when it is borne in mind that this statement was made under the solemn sanctity of an oath, at a time when no breath of suspicion rested against the defendant, that upon the trial the truth of this affidavit was only contradicted by *circumstances*, and those circumstances only maintained by the oath of a *single* witness, it would be new law and strange doctrine, devoid of both reason and justice, that under these circumstances would deprive him of its benefits.

CLENDENIN, *Attorney General, Contra:*

Dunn was indicted and convicted as an accesory to the murder of

Dunn *against* the State.

John Williams by William Broadus and John Lucas. The statute defines an accessory as one " who stands by, aids, abets, or assists, or who not being present, aiding, abetting, or assisting, hath advised and encouraged the perpetration of the crime." *Rev. Stat.* 248. And it is defined by Lord *Hale* to be one who being absent at the time of the offence committed does yet procure, counsel, or command, or abet, another to commit a felony. 1 *Hale*, 616, proof of a prior conspiracy is not *legal presumption* of having aided but only evidence, but if a conspiracy be proved, and a presence to render aid, it is *legal* presumption it was with a view to render aid, and it lies on the party to rebut it by showing he was there for a purpose unconnected with the conspiracy. 9 *Pick. R.* 496.

And testimony may be introduced to show another conspiracy to commit a felony when it indirectly appears that the commission, or the attempt to commit such felony, engenders the malice against the deceased, and as strong presumption of malice on the part of the accused.

One of the points raised and depended on by the counsel of the plaintiff in error is, that the dying declarations of the deceased were not permitted to go to the jury. The importance of this point will be decided by a reference to the testimony taken on the trial of this case, and, upon which testimony, the court below decided that the replies of the deceased to interrogatories put to him were not evidence, it not having been made appear that the deceased apprehended that he was dying, or would die; that this decision was correct, excluding the declaration, cannot be doubted. Upon the examination of the authorities on the subject, it is unquestionable law, that on the trial for murder, the declarations of the deceased, after the mortal wound is given, conscious of approaching death, may be received in evidence against the prisoner, though such declarations were not made in his presence. The principle on which this evidence is admitted, is, that they are declarations made *in extremis*, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silent, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn, and so awful, is considered by law as creating an obligation equal to

that imposed by a positive oath administered in a court of justice. See *Swift's Ev.* 124; 1 *Strange* 449; *Roscoe Crim. Ev.* 22, 23, 24; 1 *Leach*, 502; 2 *Haywood*, 31: 1 *Starkie*, 442.

Whether the deceased was conscious of approaching death is a fact to be decided by the court, in order to admit or reject the evidence of his dying declarations. *Swift's Ev.* 125, and if then it did not appear in the testimony that the deceased was aware of his approaching death, and did not appear to think he was *in extremis*, the court below certainly did not err in excluding his declarations.

Another objection on the part of plaintiff in error is, that the evidence of Joshua Skinner, the Coroner of Phillips county, was permitted to go to the jury instead of the affidavit of Dunn made before the jury of inquest.

All suspected persons may be examined, and their voluntary declarations taken without threats or promises, and reduced to writing, and read to the respective persons, and signed by them if willing. *Sec.* 14, *p.* 195, *Rev. Stat.*

Such examinations and testimony shall be certified and signed by the Coroner, and in case of death of the *witness* his deposition shall be evidence on the trial of any person present at his examination. *Sec.* 13, *p.* 195, *Rev. Stat.*

In this case Dunn was examined as a witness, but after such examination he was arrested as a party accused, and on his trial the state offered his affidavit taken before the Coroner in evidence, which was objected to on the part of the defence: the State then called Joshua Skinner, the Coroner, to prove by parol Dunn's statements before the jury of inquest, and permitted the Coroner to refresh his memory by a reference to the affidavit of Dunn. This was undoubtedly the higher and better testimony, even had it been material to the issue: the coroner had no authority to take the examination of Dunn, as a prisoner, on oath, and the statute makes no provision for reading such examination in evidence. The statute refers to witnesses who are deceased since their examination, and when the defendant was present at the examination. That the examinations of a prisoner cannot be taken on oath. See *Roscoe Crim. Ev.* 44; when a prisoner has been examined on oath, on a charge against another

person. *Parke, J.*, received evidence of that examination as a confession. *Roscoe Crim. Ev.* 44. If the examination was informal, or if the Coroner had no authority to take the examination of the prisoner, the Coroner or magistrate may refer to the examination to refresh his memory. *Roscoe Crim. Ev.* 47, 48. But in this case it is holden that neither the affidavit of the prisoner, nor the testimony of the Coroner, Joshua Skinner, had any bearing in the case, and being immaterial to the issue, the court will not give the point any weight.

RINGO, *Chief Justice*, delivered the opinion of the Court:

We will consider and dispose of the questions presented in this case in the order in which they are stated, and for the purpose of exhibiting the true ground upon which the first exception is to be decided, it is necessary to set forth so much of the testimony of the same witness, as will serve to show the connection, if any, between the matter objected to by the appellant and admitted by the court, and the criminal conduct charged against him in this case. The bill of exceptions shows that the witness, then under examination, had been called and sworn on the part of the State, and testified, in substance, that she was at the house of the appellant, Dunn, in Phillips county, about the ninth day of January, 1839, setting in the gallery, in company with Dunn's family, William Broadus, Charles Lucas, and a man by the name of Curtis; that she saw the deceased, John Williams, coming up the road with a gun on his shoulder; when in sight of the house he left the road and started around the field. That Dunn took his gun and ran across the field in the direction Williams was going: Williams run also. That after a short time Dunn and Williams returned to the house together; and Dunn said, by God, boys, I got a prisoner. Williams shook hands with the company, and then called for some liquor; and said he was never so frightened in his life as when he saw Dunn coming after him; they all drank together; and Lucas said to Williams, I understand you have offered $60 to know whose hat was left when *Dutch* was shot, meaning Christian Earnest; Williams said I did. Lucas then said would you give it now. Williams said no, for he had spent part of the money.' Lucas then asked Williams what he would do if he knew who done it. Williams said

31

I would bring them to justice. Curtis said, by God, Dunn, he belongs to the strong party. Dunn said yes, we must look out. Lucas and Broadus then commenced quarrelling with Williams, who said he had never had a quarrel with any man, and he hoped he never should, although he was no better to receive a load of shot than any body else. Dunn remarked, you had better take care or you may catch one before you are ready for it. While they were quarrelling, Williams appeared to wish friendship, said he was going up to Askew's for some honey, bid good day, and started up the road; that soon after Williams started, Broadus took his gun and started in the same direction. Witness was standing in the back porch, and Broadus looking round, saw her, stopped, and came to the house, passed through the porch, and beckoned to Lucas; when Lucas took Dunn's gun and started. The gun was at the door of the bar-room, and Dunn was sitting on the counter in the bar-room, with his face towards the door, where he could see Lucas take the gun. That Broadus and Lucas both followed in the direction Williams had gone, and after going some distance from the house, both started and run: soon after which witness heard a gun fire, and said to Dunn they are killing that man. Dunn said no, they are only trying their guns. In five or six minutes, witness heard another gun, and again said to Dunn, they are certainly killing that man. He again said no, they are only trying their guns, to let him know what they would do, if he did not leave the neighborhood. Curtis said to Dunn, while Broadus and Lucas were absent, after they left the house, well, they have shot twice whether they have done any thing or not. Dunn made no reply. Broadus had a rifle, Lucas a shot gun, they both returned in a short time to Dunn's house, and Broadus came dancing around witness on the porch, and asked if she thought he would kill a man. She replied yes, she believed he had done it. He said no he had not, and would not. That after Broadus and Lucas returned they all went into the room and locked the door; witness went to go in and found the door locked, and Dunn's wife said she could not come in then. After they come out of the room witness's father came to Dunn's, and Broadus commenced quarrelling with him, and he and Dunn had some quarrelling also, when her father told her to get ready and go home with him when she gathered up her clothes, &c., and got

ready to start home. As she was about leaving, Dunn came to her on the porch, and said, Elizabeth, if ever you tell of what you have seen and heard here this day, I will hear of it, and it will not be well for you. On the way to her father's she saw in the road a paper wadding, fresh from the gun, where they had shot Williams; when about half a mile above Dunn's, and near Mr. Pledgers, they saw Williams lying on the bank of the river, moaning, and the persons around him said he was shot; when cross-examined, she said Dunn did not quarrel with Williams, but Broadus and Lucas did. That Williams had been at the house two or three times before, but she never heard Dunn make any threats against him. At this stage of the examination the prosecution asked the witness to state what she knew about the shooting of the Dutchman, (Christian Earnest,) which had taken place some days before. The prisoner objected to her answering or stating any thing in relation thereto, but his objections were overruled by the court, and the witness permitted to proceed, when she testified as follows: one evening Dunn had been down to a sunk boat, and was returning in his skiff about dark when he met Broadus and Lucas going down, got out of his skiff, and went back with them in theirs. Same night Dunn returned at one o'clock; asked his wife when he got in bed where witness was. His wife answered she was in the other bed, in the room, but that she was asleep, that she (his wife,) had called witness, and she did not answer. Dunn then told his wife that they had shot Dutch, meaning (Christian Earnest,) but they had not killed him, that Dutch was picking up wood when he was shot, and that he run, and hallooed to some one in the house, boys I am shot, but not bad hurt, or killed yet. Dunn said that the damned fool when he shot had run and left his hat. She told no person of these transactions until she went home, when she told her father and mother; and afterwards, when she went to live at Mr. Swearingen's she told him.

That testimony of the person's guilt, or participation in the commission of a crime, or felony, wholly unconnected with that for which he is put upon his trial, cannot, as a general rule, be admitted, is unquestionably true; but in cases where the *scienter* or the *quo animo*, is re_ quisite to, and constitutes a necessary and essential part of the crime with which the prisoner is charged, and proof of such guilty know-

ledge, or malicious intention, is indispensable to establish his guilt, in regard to the transaction in question, as in cases of forgery, murder, and the like; testimony of such acts, conduct, or declarations of the accused as tend to establish such knowledge or intent, is competent legal testimony to go to the jury, notwithstanding they may constitute in law a distinct crime. Thus, upon an indictment for murder, former grudges and antecedent menaces may be proved to show the prisoner's motive against the deceased. 1 *Phil. Ev.* 169; *Ros. on Ev.* 71. Testimony however of a distinct murder, committed by the prisoner at a different time, or of some other felony, or transaction committed upon, or against a different person, and at a different time, in which the prisoner participated, cannot be admitted until proof has been given establishing or tending to establish the offence with which he is charged, and showing some connection between the different transactions; or such defects or circumstances as will warrant a presumption that the latter grew out of, and was to some extent induced by some circumstances connected with, the former, in which case, such circumstances, connected with the former, as are calculated to show the *quo animo*, or motive by which the prisoner was actuated, or influenced, in regard to the subsequent transaction, are competent and legitimate testimony.

In the case before us, no upright mind possessed of rational powers, can hear and contemplate the facts and circumstances detailed in testimony by the witness, before she was asked to state what she knew about the shooting of Earnest, without perceiving at a single glance that the death of Williams may have been, and most probably was induced by the interest he had manifested, to ferret out and bring to justice those who had attempted the assassination of Earnest. And that it was prompted by the desire on their part to shield themselves from the consequences of a prosecution therefor, by the destruction of one who had manifested a disposition to acquire information and knowledge as to the perpetrators of that crime, and expressed his determination to bring them to justice, if he knew who they were, must be obvious to every capacity, nor does it require more discrimination to discover the tendency and probable consequences of the acts and conduct of Dunn towards Williams. On the same day, and but

a short time previous to his murder, consummated at once by the catastrophe itself and confirmed as well by his conduct during the absence of Broadus and Lucas as upon and after their return to his house. And, therefore, testimony of Dunn's participation in the attempted assassination of Earnest was material and legitimate to show the motive by which he was influenced in his conduct towards Williams, and fix upon him the charge of deliberate malice and settled hate towards the deceased, by showing such facts, as in the ordinary course of human events would seldom, if ever, fail to produce that state of feeling in the mind of the culprit, towards one whose determination to bring him to justice was known to and feared by him, and for this purpose the enquiry was proper, and the testimony elicited by it competent, as tending directly to establish a matter in issue constituting an essential ingredient in the crime charged in the indictment against Dunn, and therefore the court did not err in permitting the declarations of Dunn, as to his participation in the attempt to assassinate Earnest, to go to the jury as testimony in the case.

After the testimony, as above stated, had been given, another witness was called on the part of the prosecution, who proved that in January, 1839, he was at work in his field and heard the report of a gun, and soon after a second report of a gun, and heard some body cry murder, but he paid no attention to it until Mr. Pledger, who lives near to him, sent for him to go and see a man who had been shot, when he went with Mr. Pledger down the bank of the river, where they found John Williams lying in Pledger's boat, moaning and making a great noise, and saying he was shot, but witness supposed he was drunk until they raised him up and saw the bullet holes and blood in his clothes. He complained of being sick, and asked for water, which they gave him, and laid him down on the ground. He said he wanted to go down to Mr. Dodge's, who lived below Mr. Dunn's, and he would give $150 to any one who would take him there in a boat, which no one appeared willing to do, and they all went up on top of the bank, and Williams crawled up, untied the canoe, got into it, and crossed the Mississippi river to a sand bar on the opposite side, which was the last he saw of him until he was taken up to be examined by the inquest several days after; when

they were standing on the bank, Mr. Sprague and his daughter Eliza-
beth Sprague came along. When Williams' body was taken up
there were two bullet holes in his back; one of them had ranged for-
ward through the bowels and lodged against the skin, where it was
cut out at the time the inquest was held, and he believes his death,
was occasioned by the wounds inflicted. He was not acquainted with
Williams, never having seen him until after he was shot. Upon cross-
examination he stated that Sprague and daughter passed by a short
time after the guns were fired the precise time he could not tell, but
supposed twenty or thirty minutes, the defendant then asked the wit-
ness to state whether Williams did not say when he went to him that
he was shot by mistake, to which he replied he did say so, but the
prosecution objected to the question, and the court directed the jury
that it was not evidence, it not having been made to appear that the
deceased apprehended that he was dying, or would die.

Another witness was then introduced on the part of the prosecution
who testified to the same facts as the last, and was asked the same ques-
tion as to Williams' declaration, how he had been shot, which was
objected to by the prosecution, and the objection sustained by the
court, and upon this state of the evidence the appellant insists that the
declaration of Williams that he was shot by mistake was competent
testimony, and the court erred in excluding it from the jury as de-
posed by the witness, and also in refusing to suffer the last witness to
testify as to that fact, and state the declaration of Williams as to his
having been shot by mistake.

The only satisfactory principle upon which the dying declarations
of a person deceased can be admitted to establish the circumstances
of his death, appears to us to be that they were made at a time when,
in the mind of the deceased, all expectation of recovery was yielded
up, and supplanted by the conviction that he would certainly die by
reason of the injury received, and under which he then languished when,
in the language of Chief Baron *Eyre*, in *Woodcock's case*, 1 *Leach*,
502, "every hope of this world is gone; when every motive to false-
hood is silenced, and the mind is induced by the most powerful
considerations to speak the truth, a situation so solemn and awful is
considered by the law as creating an obligation equal to that which is

imposed by an oath administered in court;" and therefore to warrant their admission it must be shown in the first place that the declaration was made under an apprehension of impending death. And this may be collected from the nature and circumstances of the case, although the declarant did not express such an apprehension; nor is it essential that the party should apprehend immediate dissolution. It is sufficient if he apprehends it to be impending and certain; and this is always a question for the court to determine upon consideration of all the surrounding circumstances. 2 *Starkie Ev.* 460; *Roscoe Crim. Ev.* 25. Having thus ascertained the governing principle, and also attentively considered all the circumstances in testimony, when the court excluded and refused to admit the declarations of Williams as testimony in the case as above stated, we are clearly of the opinion that there is nothing in the circumstances, as detailed by the witnesses, tending to prove that the mind of Williams was impressed with the conviction that his wounds were mortal, and he could not survive them, or recover from the injury thereby inflicted on him. He said he was shot, and moaned and made a great noise, complained of being sick, and asked for water, expressed a desire to go down to Mr. Dodge's, and offered $150 to any one who would take him there in a boat; but afterwards untied the canoe, got into it, and crossed the Mississippi river to a sand bar on the opposite side. No examination of his wounds was made, nor was any intimation of his opinion as to their magnitude and probable effect given by the deceased, whose strength was not exhausted, though his wishes were disregarded. And when apparently abandoned to his fate, we find him escaping from the scene of violence and outrage to the desolate sand beach on the opposite side of the Mississippi, as if from fear of those around him, he sought refuge and security for his life by placing that great water between himself and the danger he apprehended of further injury from those who sought his destruction, while nothing transpired on his part calculated to evince the consciousness of his certain danger, or inevitable death from the injury which he had already suffered, and therefore the court, in excluding testimony of his declarations as to the circumstances of his being shot, did not err, but under the circumstances the testimony was properly rejected.

The record shows that the attorney for the State offered in evidence the affidavit of the appellant Dunn, taken before the Coroner at the inquest held by him over the body of Williams, which was objected to, when the attorney for the State introduced the Coroner as a witness to prove the statements made by Dunn at the inquest aforesaid, and the witness not recollecting them, was suffered to refer to said affidavit to refresh his memory, to which Dunn objected, and his objections being overruled he excepted to the opinions and decisions of the court in overruling his objections, and admitting oral testimony of the facts, deposed to and statements made by him, on oath, before the Coroner, at the inquest held by him over the body of Williams, which had been reduced to writing and subscribed by him, and attested by the Coroner, as well as the opinion of the court, allowing said witness to refer to said affidavit to refresh his memory as to the facts therein deposed to, and stated on oath by Dunn, the whole of which, as well as the oral testimony of the witness given on the trial is set forth in the bill of exceptions, but it is deemed unnecessary to state them here, as the question does not depend upon the facts exhibited by both, or either of them.

It is a general principle of evidence that secondary and inferior evidence, when it is attempted to be substituted for evidence of a higher and superior nature, must be rejected, the law requiring the best evidence to be adduced which the case admits of. And it is a universal rule that the contents of a writing cannot be proved by a copy, still less by mere oral evidence if the writing itself be *in* existence and attainable, and it is a general and most inflexible rule that oral evidence cannot be substituted for a written document, which, by authority of law, or by private compact, is constituted the authentic and appropriate instrument of evidence. 1 *Stark. Ev.* 102, 309, 394. By the law in force in this State, when the inquest was held over the body of Williams, it was, amongst other things, made the duty of the Coroner to charge the jurors " to inquire of the persons, who, if any, were present, the finder of the body, his or her relations and neighbors, whether he or she was killed in the same place where the body was found, and if elsewhere, by whom, and how the body was brought thence." It was his duty also to administer an oath or affirma-

tion to the witnesses, and their evidence was required to be taken down in writing and subscribed by them, and returned by him, with the inquisition, to the next Circuit Court, to be holden within the county. It is therefore very clear to our minds that the deposition of Dunn, taken before the Coroner, reduced to writing, and subscribed by the deponent, and attested by the Coroner, at the inquest held by him over the body of Williams, and by him subsequently returned to the Circuit Court, with the inquest, is a written document, which, by authority of law, is constituted the authentic and appropriate instrument of evidence, of what the witness then stated, and the deposition itself being in existence, and attainable, being then in court, in the hands of the attorney for the State, and oral evidence of the contents thereof, could not legally be admitted on the part of the prosecution. Besides which, the 67th section of chapter 45 of the Revised Statutes of this State, in force at the time of this trial, declares that "in all cases where two or more persons are jointly or otherwise concerned in the commission of any crime or misdemeanor, either of such persons may be sworn as a witness in relation to such crime or misdemeanor, but the testimony given by such witness shall in no instance be used against him in any criminal prosecution for the same offence." *Rev. Stat. Ark.* 296. In this case Dunn, if guilty at all, as charged in the indictment, must have been concerned with Broadus and Lucas in the murder of Williams, and his deposition in question was given by him as a witness in relation to the very crime with which he is now charged as accessory before the fact, and for which he is prosecuted in this case, and therefore the statute expressly forbids his testimony, given at the Coroner's inquest, being used against him, and therefore neither the deposition itself, or parol testimony of its contents, or of what he then stated in testimony before the Coroner, can now be legally admitted as evidence against him, in any prosecution for the murder of Williams, or as accessory thereto.

Hitherto we have considered such objections only as were presented by the appellant, and so far regarded and treated the proceedings which appear to have taken place in relation to this prosecution, subsequent to the indictment, as the judicial acts and proceedings of a legally constituted judicial tribunal, clothed with competent judicial

32

powers to determine the matter, but the 223d section of chapter 45 of the Revised Statutes of this State, page 316, declares that no assignment of errors, or joinder thereto, shall be necessary upon an appeal or writ of error in criminal cases, issued or taken pursuant to this act, but the court shall proceed on the return thereof without delay, and render judgment upon the record before them, whereby it becomes the duty of this court, in such cases, to consider the whole record, and render such judgment thereupon as may appear to be authorized by law. In the performance of this duty the court, upon examination of the record before them, in this case, conceived that other questions than those presented by the appellant might, and probably would, arise in the decision of the case, two of the most important of which were suggested to the counsel concerned, and argued at the bar: one of which, as was anticipated, we consider it our duty to decide; that is, as to the effect of the omission to set forth on the record an order of the Judge for the organization and holding of a special term of the Circuit Court, pursuant to the provisions of the 29th section of chapter 43 of the Revised Statutes of this State, page 233, which provides that " the Judge of any Circuit Court may at any time hold a special term for the trial of persons confined in jail, by making out a written order to that effect, and transmitting it to the Clerk, who shall enter the same on the records of the court." It is a general rule that every statute, where it is practicable, must be so construed that every part and provision contained in it may have some operation. And another rule is, that all laws which relate to the same subject, must be taken to be one system, and construed consistently. We are therefore not to look alone to the section above quoted to ascertain the object of the Legislature in authorizing special terms of the Circuit Court to be held under the particular circustances therein mentioned, and here we may be permitted to remark that it has been, as we conceive, correctly decided by the Supreme Court of the United States, that all courts, unless restrained by some statutory provision, have a right of adjourning their settings to a distant day, and the proceedings had at the adjourned session will be considered as the proceedings of the term so adjourned. *Mechanics' Bank of Alexandria vs. Withers*, 5 Peters' Cond. Rep. 22. In the present case, how-

Dunn *against* the State.

ever, it appears affirmatively by the record before us, that the proceedings against the appellant subsequent to the return of the indictment by the grand jury at the May term of the Phillips Circuit Court, A. D. 1839, were not taken at an adjourned session of said court, and that they are no part of the proceedings of that court at said term, because they are expressly stated in the record to have taken place, " at a special term of the Circuit Court, began and held at Helena, within and for the county of Phillips, in the State of Arkansas, on the 12th day of August, A. D. 1839, before the Hon. John C. P. Tolleson, Judge," which repels every presumption that they are a part of the proceedings of said court at the preceding, or any other regular term thereof, and presents the naked question, whether from the facts appearing in the record they can be regarded as the judicial acts and proceedings of a legally constituted judicial tribunal.

By the first section of the sixth article of the constitution it is ordained that the judicial power of this State shall be vested "in one Supreme Court, in Circuit Courts, in County Courts, and in Justices of the Peace. The General Assembly may also vest such jurisdiction as may be deemed necessary in Corporation Courts; and when they deem it expedient may establish Courts of Chancery." And the third section of the same article vests in the Circuit Court " exclusive original jurisdiction of all crimes amounting to felony at the common law: and requires that the Circuit Court hold its terms at such place, in each county, as may be by law directed." By these fundamental provisions the Circuit Court, as contra-distinguished from the Judge, has unalterably the exclusive original judicial cognizance of all crimes amounting to felony at the common law, but it is left to the Legislature to prescribe by law the times, as well as the place in each county, when and where the terms thereof shall be held, and it is deemed worthy of observation, that no judicial power whatever is conferred by the Constitution upon the Judge, as contra-distinguished from the court, unless he can derive it from the power with which he is clothed as a conservator of the peace within the circuit for which he shall have been elected, or may possess the power of adjudicating certain cases upon writs of habeas corpus, by virtue of that clause in the declaration of rights, in the Constitution, which prohibits any suspension

of the privilege of the writ of habeas corpus, unless where, in cases of rebellion or invasion, the public safety may require it; and it will be found upon investigation of the subject that there is no other instance in which he is possessed of, or can in his character of Judge separated and contra-distinguished from the court, exercise judicial power, the whole of which, except it is otherwise expressly delegated to some other authority or tribunal by the Constitution, is conferred upon and must remain the courts, and Justices of the Peace. The common law defines a court to be a " place where justice is judicially administered," and therefore to constitute a court there must be a place appointed by law for the administration of justice, and some person authorized by law to administer justice at that place, must be there for that purpose. Then, but not otherwise, there is a court, and the judicial power of the State may be there exercised by the Judge or person authorized by law to hold it; and if the law prescribed no time for holding the court, the Judge might lawfully hold it when, and as often, as he chose. So, likewise, if the place was left to his election, instead of being fixed and prescribed by law, he might lawfully set in judgment, where he pleased, within the territorial limits prescribed to his jurisdiction, but in this State both the time and place of holding the terms of the Circuit Court in each county, are prescribed by law, and in many counties the duration of the terms limited to a single week; in some the court is required to continue in session until the business before it is disposed of; but under particular circumstances, and subject to certain limitations prescribed by the statute, a special term of any Circuit Court may be held " for the trial of persons confined in jail," or, according to the provisions of the 28th section of the 43d chapter of the Revised Statutes, page 233, " special adjourned sessions of any court may be held in continuation of the regular term upon its being so ordered by the court or Judge in, term time, and entered by the Clerk on the record of the court;" and in either case it is essential that the order be entered on the records of the court, though the necessity for such record is more forcibly seen, if not more imperatively required, in the former than it is in the latter; because, when the time and place are prescribed by law, as they are for holding the regular terms by a general law of which every person is cognizant, all whom duty binds,

Dunn *against* the State.

or interest prompts, to be there present, know the time and place, when and where, their obligation is to be performed, or their rights, if they be suitors, adjudicated; and such persons are for most purposes presumed to be present during the term whatever may be its duration, but when the regular term has expired or determined by operation of law, or by an adjournment to the next succeeding regular term thereof, all business therein, not otherwise disposed of, is continued by operation of law, to the next regular term, and cannot, except in the particular cases specially provided for by the 29th section of the statute above quoted, be adjudicated prior to the term to which they were continued, and those concerned are under no legal obligation to be prepared therefor at a previous day; and furthermore in regard to the regular terms, nothing is dependent upon facts to be made out and recorded, to authorize their being held, as must be the case in regard to special terms ordered by the Judge and the provisions of the statute. We simply look to the law and there discover the time and place, and then turn to the record and ascertain that the Judge authorized to hold the court was then and there present, and recognize in this union and combination of circumstances a court legally constituted and vested with judicial power; the adjudications of which must be regarded as judicial. Such however is not the case in regard to a special term, the authority to hold which depends upon the following facts and circumstances. 1st. That some person is confined in jail who may be lawfully tried by that court upon some criminal charge. 2d. That it shall not interfere with any other court to be held by the same Judge. 3d. That it shall not be held within twenty days of the regular term of such court. 4th. That an order therefor, as required by the statute, be made out by the Judge, and by him transmitted to the Clerk; and 5th. That the same be entered on the records of the court. These circumstances are considered essential to the legal appointment, constitution, and organization, of a special term of the Circuit Court, because it is a special authority conferred upon the Judge to accomplish a specific and specified purpose contrary to the general and regular course of proceeding prescribed by law, and therefore being a special power, every circumstance necessary to its exercise must exist and be made to appear of record, otherwise the

power cannot appear to have been legally exercised, and the most important circumstance upon which the right of power of the Judge to order a special term of the Circuit Court is made to depend, cannot judicially appear otherwise than by being made of record, it being a matter altogether *in pais*, and if the law does not require such fact to be made of record, the statutory provisions designating a time for holding the courts is nugatory, and the Judge may, notwithstanding, hold the court as well at any other time, and proceedings thereat will have to be regarded as judicial and warranted by law, but no such construction of the several statutory provisions under consideration is, in our opinion, justifiable, because it would defeat the whole object of their enactment, and leave in the Judge a discretion of which the Legislature obviously designed to divest him. By authorizing special terms to be held for the trial of persons confined in jail, the Legislature intended to expedite the administration of justice in that class of cases only where the party to be tried is deprived of his liberty, and the power of the court, when properly organized, is limited to them, and cannot, in our opinion, under the provisions of this statute, be legally execised over any person not confined in jail when the order was made, which must be at least ten days previous to the commencement of the term. Otherwise, the provisions of the *30th* and 31st sections of the 43d chapter of the Revised Statutes, cannot be complied with, which, although they are only directory to the Judge, serve to explain and illustrate the design of the 29th section before quoted. The former requires the Judge, in his order for a special term, to issue a *venire facias* to the Sheriff, requiring him to summon a grand jury to attend such special term, if any person shall be confined in jail who may not have been indicted. And the latter requires the Judge ordering such special term, when the same shall be ordered under the provisions above quoted, to " cause a notice thereof to be served on the attorney for the State prosecuting for such Circuit, ten days before the commencement of such special term." We are therefore satisfied that the order for the special term must be made at least ten days before the commencement of the term, and designate the persons to be there tried, and state that they are confined in jail, and whether they have been indicted, previously or

otherwise, and if they, or either of them, have not been indicted for the offence for which he is to be there tried, the order must contain a direction to the Clerk to issue a *venire facias* to the Sheriff, requiring him to summon a grand jury to attend such special term of the court, which order must, according to the express requisition of the law, be transmitted to the Clerk, and be by him entered on the records of the court, when, if the time mentioned in the order for the special term be such as not to interfere with any other court to be held by the same Judge, nor " within twenty days of the regular term of such court," so that it does not come within the prohibition of the 33d or 34th sections of chapter 43 of the Revised Statutes, page 234, every requisition of the law authorizing such special term having been observed and complied with, if the record shows in addition thereto that the Judge authorized by law to hold such court was present at the time mentioned in the order for such special term at the place prescribed by law for holding such court, the court will be legally constituted; and in regard to such persons as are confined in jail and designated in the Judge's order, may legally exercise the judicial power vested in it by the Constitution, and its adjudications in such cases will possess the force and obligation of judicial acts and judicial authority, because the record and the law furnish conclusive testimony that there was a court legally organized and competent to determine the matter judicially. If these positions be not true, how are the extra-judicial acts of a Judge, if he shall assume the power of holding a special term of the Circuit Court without any order whatever appointing a time thereof, or any notice to the attorney for the State, or the persons to be tried thereat, to be distinguished from the judicial proceedings of the court? No one, we will presume, would undertake to justify such assumption of power by the Judge, and yet if the facts and circumstances, the existence and concurrence, of which are under the statute indispensable to the authority of the Judge to order or hold such special term, may be omitted in the order therefor, or need not be set forth in the record of the court. There can be no means of distinguishing the one from the other, and such acts of the Judge as are clearly unauthorized, and unquestionably void, would nevertheless carry with them and bear upon their face incontrovertible testimony that

they were the acts and proceedings of a legally constituted court, which is contrary to every principle of law and justice; besides which if such construction could be indulged, it would place it in the power of the Judge, if one could be found profligate and reckless enough for the purpose, to shield the guilty from merited punishment, or jeopardize the liberty or life of the innocent by holding a special term of the court without previous notice, or any opportunity for preparation to the one party or the other, as his prejudices, sympathies, or interest, might induce him to desire the conviction or acquittal, preservation or destruction, of the accused, and although we are fully assured that no such advantage was given to either party in the case before us, and we do not in the slightest degree censure or impugn the motives of the Judge before whom the proceedings were had in this case; for we doubt not he acted throughout the whole course of the proceeding in an upright and impartial manner, and as he conceived, legally, in the discharge of a solemn and important duty; yet it is very clear to our minds that the law under consideration was never designed to confer such power upon any Judge as would enable him in that manner to sport with public justice, and that any interpretation thereof, which would admit the existence of such power in any Judge, cannot be just; and, therefore, as such facts and circumstances, as are indispensably necessary to have existed in combination, before the Judge could legally order a special term, or a special term of the Circuit Court could be held, do not, from the record before us appear to have existed, when the proceedings in this case subsequent to the indictment, and issuing of the *capias ad respondendum*, took place, they must be considered as proceedings before the Judge simply, as contra-distinguished from the court, and cannot be regarded as the judicial proceedings and adjudication of the Circuit Court of Phillips county upon the charge preferred by the indictment against Dunn; and they are, therefore, in the opinion of this court, *corum non judice* and void, which being the case, the life of Dunn cannot be considered as having been within the contemplation of law put in jeopardy thereby, and therefore there is no necessity for us to decide in this case any thing as to the effect and operation of the provision in the Constitution of this State, as well as the United States, that " no person shall for the

same offence be twice put in jeopardy of life or limb," as he may yet be lawfully tried precisely as if no such proceeding had ever taken place before the Judge.

And this imposes upon us the necessity of inquiring into and ascertaining whether this is, under the circumstances, a case within the appellate jurisdiction of this court, under the Constitution and the laws restricting and regulating the right of appeal to this court.

In the second section of the sixth article of the Constitution it is, amongst other things, ordained that "the Supreme Court, except in cases otherwise directed by this Constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State under such restrictions and regulations as may from time to time be prescribed by law." This fundamental law, so far as it relates to the present question, does not, in any respect, differ materially from that clause in the Constitution of the United States, which declares that "the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make;" in commenting upon which, and defining the meaning of the terms "appellate jurisdiction," as there used, Judge *Story*, in the third volume of his Commentaries on the Constitution, page 626, says "the essential criterion of appellate jurisdiction is that it revises and corrects the proceedings in a cause already instituted, and does not create that cause in reference to judicial tribunals: an appellate jurisdiction, therefore, necessarily implies that the subject matter has been already instituted in, and acted upon, by some other court, whose judgment or proceedings are to be revised. This appellate jurisdiction may be exercised in a variety of forms, and, indeed, in any form which the Legislature may choose to prescribe, but still the substance must exist before the form can be applied to it."

To operate at all then, under the Constitution of the United States, it is not sufficient that there has been a decision by some officer or department of the United States. It must be by one clothed with judicial authority and acting in a judicial capacity. And it is upon this principle that the Supreme Court of the United States, in the case of *Marbury vs. Madison,* reported 1 *Cranch,* 175, and 1 *Peters' Cond. Rep.* 267, refused to entertain jurisdiction of that case, which was an

33

application for a writ of *mandamus* to the Secretary of State of the United States, directing him to deliver to Marbury his commission as Justice of the Peace for the county of Washington, in the District of Columbia, and decided that it was neither a case within the appellate or original jurisdiction of the Supreme Court, as unalterably defined and prescribed by the Constitution; and held so much of the act of Congress to establish the judicial courts of the United States as purported to authorize the Supreme Court " to issue writs of *mandamus* in cases warranted by the principles and usages of law," to any person holding office under the " authority of the United States," other than the judicial courts of the United States, to be repugnant to the Constitution, and therefore void, and the principle upon which this decision was made has never, within our knowledge, been, and, in our opinion, never can be, successfully controverted.

And, in our opinion, the same language, as it is used in that clause of the Constitution of this State, now under consideration, must receive the same construction, and have the like application given to it as has been given thereto, and used in the Constitution of the U. States; for they are used in reference to the same object, that is, to define in part the jurisdiction of the Supreme Court, and were adopted by those who framed the Constitution of this State, with a full understanding of their application, as ascertained and defined by the adjudications and commentaries aforesaid; and, therefore, it is reasonable to presume that they were not designed to include any thing more than they are understood and held to embrace by the construction which they had previously received; and it is, therefore, to our minds, manifest that the appellate jurisdiction of this court does not, and under the Constitution can never be made to extend to the proceedings or decision of any officer or tribunal whatever, other than the judicial proceedings or determinations of some court or Justice of the Peace vested with some portion of judicial power by or under the authority of the Constitution itself; and as we have already determined that the proceedings which from the record before us appear to have taken place subsequent to the indictment being returned at the regular term of the Circuit Court, in May 1839, must be considered as proceedings before, and decisions of, the Judge simply, and not of the court,

and that they are *coram non judice.* It follows, as a necessary consequence, that the Superior Court has not appellate jurisdiction of the case, wherefore the same ought to be, and hereby is, dismissed from this court. But from the proceedings which appear by the record before us to have taken place before the Judge of the Circuit Court of Phillips county, in relation to the crime with which the appellant stands charged by the indictment returned into said Circuit Court, and still pending therein against him for adjudication, we consider it our duty to exercise the authority vested in the Supreme Court by the Constitution, by suspending absolutely all of the proceedings in this cause had before the Judge of the Circuit Court of Phillips county aforesaid, since the adjournment or expiration of the regular term of said court, which commenced on the first Monday of May, A. D. 1839, as the same appear to have taken place improvidently, irregularly, and illegally, and to have been entered on the records of said court as parcel of the judicial proceedings thereof, and the Clerk of this court is hereby directed and required to issue a writ of supersedeas, without delay, to the Judge of said Circuit Court, and the Sheriff of said county of Phillips, commanding them, and each of them, to supersede and desist absolutely and for ever from further proceeding in the execution of the said extra-judicial sentence of death pronounced against the said Hiram Dunn, which appears by the record before us to have been entered on the record of said Circuit Court on the 17th day of August, A. D. 1839.