<hr />

## THE STATE *ex rel.* KLOTZ v. ROSS *et al.*

### In Banc, November 9, 1893.

1. **Circuit Court:** SPECIAL JUDGE: ADJOURNMENT: COLLATERAL ATTACK.  A special judge elected by the members of the bar, in case of the absence or disqualification of the regular judge, has, under Revised Statutes, 1889, section 3326, all the powers of the latter and is under no duty or obligation to the regular judge, and proof of the fact that the special judge adjourned court before the arrival of the regular judge, in violation of an agreement with him, is inadmissible to affect the integrity of the record in a collateral proceeding.

2. ———: ———: ———.  A special judge can adjourn court in course where the regular one can do so.

3. ———: ———: MANDAMUS: RECEIVER.  An order of a special judge setting aside an order previously made by the regular judge in vacation, appointing a receiver for a corporation, cannot be assailed on the ground of the special judge's kinship to a stockholder in the corporation in a *mandamus* proceeding by the person whose appointment is so revoked to compel the delivery to him of the corporate property by a receiver appointed by another court.

4. ———: ———: ———: ———.  While such order may be attacked for fraud in a direct proceeding for that purpose, it cannot be collaterally assailed.

5. **Court:** ADJOURNMENT: REGULAR AND SPECIAL JUDGE. A regular judge has no power to reopen a term of court after it has been adjourned to the next regular term by a special judge.

## Mandamus.

PEREMPTORY WRIT DENIED.

*H. S. Priest, Alex. G. Cochran* and *M. L. Clardy* for relator.

(1) *Mandamus* is a proper remedy to test the right of relator to the possession of the property committed to his charge by the Stoddard court as its executive officer, or its hand; and more especially is this true under circumstances of a case where the contest is between two courts of co-ordinate jurisdiction involving priority of right and over which this court alone by the terms of the constitution has supervising and superintending control. *Com. v. Denison*, 24 How. 66; *Lagrange v. State Treasurer*, 24 Mich. 468; *Tawas v. Railroad*, 44 Mich. 479; *State v. Baggott*, 96 Mo. 71; Constitution of Missouri, art. 6, sec. 3; *State v. Tracy*, 94 Mo. 217; *State v. Laughlin*, 75 Mo. 366; *McGary v. Rogers*, 35 Ark. 298; *Ex parte King*, 27 Ala. 387; *Ex parte Morgan*, 30 Ala. 50; *Ex parte Thornton*, 46 Ala. 384; Merrill on Mandamus, sec. 198. (2) The Merriam suit was begun first. It was, in part, a proceeding *in rem*, and, by entertaining this suit, the Stoddard circuit court acquired plenary jurisdiction over the *res*, and had from thenceforth the legal priority of control over the *res* whenever, in the conduct of the suit, it became necessary or expedient to assume possession, as against all other tribunals, save those having a direct supervisory control over it, or one having some superior jurisdiction in the premises. *Union Trust Co. v. Railroad*, 6 Biss. 198; *Gaylord v. Railroad*, 6 Biss. 290; *Judd v. Railroad*, 24 Blatch. 420; *Young v. Rollins*, 85 N. C.

488; *Heidritter v. Oil Co.*, 112 U. S. 294; *Cooper v. Reynolds*, 10 Wall. 308; *Barton v. Barbour*, 104 U. S. 126; *French v. Hay*, 22 Wall. 250; High on Injunctions, sec. 17. (3) If the order appointing Klotz on March 3, by Judge Wear in vacation, was void because the bill under which the order was made had not been filed, then, for the very same reason, the order of Judge Ross, made on the fourth of March, appointing Houck receiver, is also void. There is this difference, however. In Houck's case, there is no subsequent order fortifying his appointment; whereas, in Klotz' case, Judge Wear made an order on the thirteenth of March expressly ratifying and confirming the order of the third and in terms appointing Klotz anew. *Bank v. Kent*, 43 Mich. 297; s. c., 5 N. W. Rep. 627; *Jones v. Schull*, 45 Mich. 380; s. c., 8 N. W. Rep. 68; *Jones v. Bank*, 10 Col. 473; s. c., 17 Pac. Rep. 272–276; *Anonymous*, 1 Atk. 578; *Ex parte Whitfield*, 2 Atk. 315; *Ex parte Mountford*, 15 Vesey, 445; *Kattenstroth v. Bank*, 2 Duer, 632; *Crowder v. Moore*, 52 Ala. 220; *Hardy v. McClellan*, 53 Miss. 507; *Mining Co. v. Holleman*, 27 Pac. Rep. 413; *Baker v. Backus*, 32 Ill. 79; *Re Hancock*, 27 Hun, 575. (4) Respondents rely, for the maintenance of their cause and the defeat of relators, upon the action of Special Judge Houck on March 13 in sustaining the motions to dismiss Klotz as receiver. These orders are absolutely void for the following reasons: *First.* Houck was disqualified to act because he was the brother of Louis Houck, who was interested in the case. This disqualification exists by virtue of the moral sense of mankind, the common law and the statute law. Revised Statutes, 1889, sec. 3247; *Oakley v. Aspinwall*, 3 N. Y. 547; *Dimes v. Canal Co.*, 3 H. L. 793; *Post v. Black*, 5 Denio, 67; *Stockwell v. Township Board*, 22 Mich. 345; *Place v. Mfg. Co.*, 28 Barb. 503; *Co. v. Keyser*, 58 Cal. 322; *Pierce v. Selden*, 13 Johns.

190; *Ins. Co. v. Price*, 1 Hop. Ch. 3; *Foot v. Morgan,*. 1 Hill N. Y. 654; *Petition, New Boston*, 49 N. H. 329; *Hall v. Thayer*, 105 Mass. 219; *Taylor v. Com'rs*, 105 Mass. 225; *Reams v. Kearns*, 5 Cold. (Tenn.) 220. *Second.* They were collusively and fraudulently entered; and this can be shown collaterally. *Callahan v. Griswold*, 9 Mo. 792; *Higgins v. Peltzer*, 49 Mo. 152; *Mandeville v. Reynolds*, 68 N. Y. 528. *Third.* They were void because the case of Merriam was not pending at that term of the court. It was only there upon a rule to show cause. The motions upon which these orders were entered were original motions, not a showing of cause in response to the notice. *Newton v. Newton*, 32 Mo. App. 162. Revised Statutes, 1889, section 2086, provides that, "Motions in a cause filed in term shall be filed at least one day before they may be argued or determined." *State v. Underwood*, 76 Mo. 630; *Valle v. Picton*, 91 Mo. 210; *Cashman v. Anderson*, 26 Mo. 67. (5) Judge Wear had the power whether in term or chambers to make the order of the thirteenth of March, confirming his previous appointment and appointing Klotz anew. This he did, and not only had it entered upon the record but also signed as judge, and had it filed with the clerk. Its efficacy does not depend upon the capacity in which it recites it was made, but upon the fact whether he had power to make it at the time it was made. *Com'rs v. January*, 94 U. S. 202; *State v. Derkum*, 27 Mo. App. 628; *Garlick v. Dunn*, 42 Ala. 404; *Venable v. Curd*, 2 Head, 582; *Hensley v. State*, 3 Heisk. 202; *Carli v. Rhener*, 27 Minn. 292; Revised Statutes, 1889, sec. 2193; *Greeley v. Bank*, 103 Mo. 212; *Cox v. Volkert*, 86 Mo. 511; *State ex rel. v. Rombauer*, 104 Mo. 619; *Walters v. Co.*, 50 Fed. Rep. 316. (6) The Cape Girardeau court of common pleas. had no jurisdiction to appoint a receiver under the bill, nor could it acquire, by virtue of the bill, any such

The State ex rel. v. Ross.

jurisdiction, and its attempt in that behalf is absolutely void. *Jones v. Bank*, 10 Col. 473; s. c., 17 Pac. Rep. 272; *French Bank case*, 53 Cal. 495; *Hugh v. McRhea*, Chase's Decs. 466; *Kimball v. Goodburn*, 32 Mich. 12; *Bangs v. McIntosh*, 23 Barb. 599; *Attorney General v. Bank*, 1 Hop. 354; *Attorney General v. Ins. Co.*, 2 Johns. Ch. 271; *Neal v. Hill*, 16 Cal. 145; *Port Huron v. Judge*, 31 Mich. 456; Wait on Insolvent Corporations, sec. 183; *Gregory v. Gregory*, 1 Jones & Spencer, 39; *French v. Gifford*, 30 Iowa, 148. Judgment void: *Fithian v. Monks*, 43 Mo. 502, and cases cited. The following cases are clearly distinguishable: *Railroad v. Humphreys*, 145 U. S. 105; *Railroad v. Trust Co.*, 23 Fed. Rep. 514 and 29 Fed. Rep. 618. (7) Upon the merits, the court should order the property delivered to the Stoddard court, where alone, as between it and the common pleas court, it can, according to the usual and orderly course, be administered.

*John W. Noble, G. D. Reynolds* and *M. R. Smith*, and *Oliver & Miller*, of counsel, for respondents.

(1) The relator must show at the commencement of the proceeding a subsisting, valid and clear claim in himself to the relief sought. High's Extraordinary Legal Remedies (1874), sec. 10, and authorities there cited. This relator did not have these and cannot acquire them now. (2) The relator must recover, if at all, not only on the strength of his own title, but in strict accordance with the averments of the alternative writ, and to enforce a special duty imposed by law—a duty resulting from official station or, if a corporation, expressly imposed by statute. *Com. v. County Com'rs*, 5 Rawle 75. It must be a duty resulting from official station. *Dunklin County v. District County Court*, 23 Mo. 449. (3) One and same writ cannot be directed to two or

more respondents, having separate interests. 14 American and English Encyclopædia of Law, p. 219; *State v. Chester*, 10 N. J. L. 292; *State v. Railroad*, 39 Minn. 219; *State v. Reno Co.* (Kan.), 16 Pac. Rep. 337; *State v. Police Jury* (La.), 3 So. Rep. 88; *People v. Yates*, 40 Ill. 126. The writ will not issue against a private citizen, and issues against a corporation only when the statute imposes a specific duty upon it. 14 American and English Encyclopædia, p. 165, sec. 8; p. 152, sec. 7; *State v. Powers*, 14 Ga. 388. (4) The response of respondents to what relator calls his reply, offered to be filed at trial, is allowable and required by statute. Revised Statutes, 1889, "Mandamus," secs. 6812, 6813. (5) The relator should not be permitted to insert by amendment to writ new matter to strengthen his hold. (6) The Cape Girardeau common pleas had jurisdiction in equity. *Fulenwider v. Fulenwider*, 53 Mo. 439; *Roth v. Tiedeman*, 53 Mo. 489; Revised Statutes, 1879, sec. 1105; also 1889, sec. 3321; also 1889, p. 2219. *Stare decisis et non quieta morere.* (7) This is substantially admitted in relator's answer to respondent's return. (8) The particular action in which Mr. Houck was appointed receiver was within the jurisdiction of the common pleas court. *Wabash, etc. Co. v. Trust Co.*, 23 Fed. Rep. 514; s. c., 23 Fed. Rep. 863, 868; s. c., 29 Fed. Rep. 618; *Railroad v. Humphreys*, 145 U. S. 105. (9) The judicial action taken in the appointment of Houck as receiver cannot be annulled or questioned by a proceeding by *mandamus* in the supreme court of the state. *State ex rel. v. Wilson*, 49 Mo. 146. *Mandamus* cannot control judicial action, nor be used to serve as an appeal or writ of error. *State ex rel. v. Flad*, 108 Mo. 614; *State ex rel. v. Smith*, 107 Mo. 527–535; *State ex rel. v. Young*, 84 Mo. 90. A writ of prohibition is the only writ by which a lower court can be restrained from the

exercise of a jurisdiction it does not have.   12 American and English Encyclopædia of Law, 311–316; *Hander & Co. v. Keating*, 26 Ark. 51; *State ex rel. v. Lafayette Court*, 41 Mo. 222; *County Court v. Inhabitants*, 10 Mo. 679; *State, etc. v. Byers*, 67 Mo. 704; *Thomas v. Mead*, 36 Mo. 247.   (10) The relator has elected to proceed, and is proceeding, in the common pleas court on motion there filed by him, never withdrawn—and there pending and about to be heard—for same relief here asked.   *McClanahan v. West*, 100 Mo. 322.   Such action is a bar to *mandamus*.   High's Extraordinary Legal Remedies (1874), sec. 188; *Maynard v. Bond*, 67 Mo. 315; *Greeley v. Bank*, 103 Mo. 212; *Thompson v. Greeley*, 107 Mo. 57.   (11) The averment in the writ, that Mr. Houck conspired with Judge Ross and other respondents to procure his appointment as receiver, is not supported by the statement of a single fact, and there has not been a particle of proof adduced to warrant it.   (12) The relator had, and has, no title on which to proceed, either here or elsewhere, to demand or require possession from respondents, or either of them.   *First*. There was no suit commenced when he was appointed.   Revised Statutes, 1889, sec. 2013.   *Second*. A judge at chambers has no power to appoint a receiver in an action yet to be commenced.   *Grey v. Doak*, 47 Kan. 236; 27 Pac. Rep. 413; 27 Pac. Rep. 963; *Crowder v. Moore*, 52 Ala. 221; *Hardy v. McClelland*, 53 Miss. 511; *Bank v. Kent*, 43 Mich. 296; *Jones v. Schall*, 45 Mich. 380; *Jones v. Bank*, 10 Col. 473.   (13) When the causes of action are different under which several receivers are appointed, the one that first gains possession of the subject-matter retains it.   *Ulmer v. Atlanta, etc. Co.*, 2 Woods (U. S.), 409.   In a conflict of two co-ordinate courts, as to the jurisdiction over property, it is the universal rule that the tribunal in which jurisdiction

first attaches by the seizure of the property and custody thereof under its process must prevail. *Metzner v. Graham*, 57 Mo. 404; see, also, 79 Mo. 667; 70 Mo. 217; 72 Mo. 632; 34 Mo. 432; 79 Mo. 431; 66 Mo. 660; 77 Mo. 332. (14) The mortgages under which Merriam claims, and under which alone relator Klotz was appointed, do not cover the property attempted to be given to Klotz, as receiver, and it would be against the law of the land and the constitution of the state and of the United States for this court to authorize or support his claim in this proceeding. Constitution United States, Amendments, art. 5; Constitution of Missouri, art. 2, sec. 30. *Mays v. Rose*, Freeman (Miss.) 730; *Leavitt v. Yates*, 4 Edw. Ch. 162; *Beecher v. Bininger*, 7 Black, 170. The plaintiff, to authorize a receiver, must show either a clear right to the property, or that he has some lien on it, or that it constitutes a special fund for his satisfaction. *Chicago v. United States, etc. Co.* 57 Pa. St. 91; *Pullan v. Cincinnati, etc. Co.*, 4 Biss. (U. S.) Rep. 50; *O'Mahony v. Belmont*, 62 N. Y. 143; Cooley's Constitutional Limitation [3 Ed.], *355, 356, 358, 362, 363 and notes; *Clark v. Mitchell*, 64 Mo. 564; *Fletcher v. Peck*, 6 Cranch Rep. 87; *Wynchamer v. The People*, 3 Kern. 378; *State ex rel. v. Miller*, 66 Mo. 328. (15) The order appointing relator Klotz a receiver, was duly and legally vacated by the then duly elected and acting special judge for the term, George Houck, on March 13, 1893, and the action of the circuit court Judge, Wear, in attempting to expunge the record of the court, was illegal and void. Nor can this honorable court support the action of Judge Wear, in this proceeding, by *mandamus*. *State v. Sanders*, 106 Mo. 188; *State ex rel. v. Bacon*, 107 Mo. 627; *Brewer v. State*, 6 Lea (Tenn.) 203; *Elms v. State*, 10 Hump. 113; *Littleton v. Smith*, 21 N. E. Rep. 886. (16) There was no authority in Judge Wear to reconvene the

court after it had been adjourned by the special judge for the term. *Stovall v. Emerson*, 20 Mo. App. 322–324, (17) The record was made up by Judge Houck signing the minutes, as he did, and which have been introduced and allowed as the record by this honorable court. The plea that there is no record (until record) is overthrown. 1 Chitty on Pleadings, 418; 3 Blackstone, 331; 2 Tidd's Practice, 741; 2 Black on Judgments, sec. 902, p. 1079; *Jeffries v. Fisher*, 51 Mo. 217; *Fritz v. Fisher*, 5 Clarke (Penn.), 350; *Dixon v. The Judge*, 4 Mo. 286; *Hill v. Mendenhall*, 21 Wallace 454. (18) Judge Wear in making the entry attempting to annul the record of the court, not only acted without authority as a judge—but against all law. He proceeded without notice—without inquiry, and condemned without a hearing. He did all the laws and the constitution are ordained to prevent. *Clark v. Mitchell*, 64 Mo. 564; Cooley's Constitutional Limitations [3 Ed.], 365–363. (19) This honorable court cannot by *mandamus* on testimony, establish Judge Wear's action, nor overthrow that of Judge Houck, and thereupon grant a peremptory writ. *Mandamus* cannot be used to alter a record. It has never been used for such purpose. This has been the law of Missouri for more than fifty years. *Dixon v. The Judge*, 4 Mo. 286; Merrill on Mandamus, secs. 3 and 61; High on Extraordinary Remedies, sec. 580, p. |414; Story on Equity Pleading [10 Ed.], secs. 322, 553 ; *Gay v. Gilmore*, 76 Ga. 225; *Montague v. Dudman*, 2 Ves. Sr. 396; *Essex v. Bank*, 14 N. J. L. 79. (20) The special judge was not disqualified. He was not interested in the controversy where he acted. He was not of kin to any of the parties in the suit where he acted, and he had not been of counsel in that suit. There are no sufficient allegations to show him disqualified. 1 Black on Judgments, sec. 266, p. 325; *Fowler v. Brooks*, 64 N. H. 423; *Trawick v.*

*Trawick*, 67 Ala. 271; *Rogers v. Felher*, 77 Ga. 46; *Littleton v. Smith*, 21 N. E. Rep. 886. (21) There has been no testimony or proof adduced to support the charge of conspiracy alleged between George Houck, Louis Houck and his attorneys. There is no claim but that to vacate the receivership of Klotz was a legal act, and the right thing to do. Conspiracy cannot be effectually affirmed of a lawful act. *Hunt v. Simonds*, 19 Mo. 583; *Alexander v. Relfe*, 9 Mo. App. 133.

GANTT, J.—This is an original proceeding in this court to obtain a peremptory writ of *mandamus* commanding the above named respondents to deliver to the relator, Eli Klotz, all and singular the railway property, effects and credits of the St. Louis, Cape Girardeau & Fort Smith Railway, a railroad organized under the laws of this state, and running from the city of Cape Girardeau westward to a point in Carter county, Missouri, about one hundred miles in length.

Upon an application filed in this court on March 16, 1893, an alternative writ issued to the respondents to show cause, on March 25, 1893, why a peremptory writ should not issue. The alternative writ was duly served and return made on the twenty-fifth of March, and leave taken by both sides to take evidence. John W. Dryden, Esq., of the St. Louis bar, was appointed a special examiner to take the proof and report to this court on May 2. This was done, and on the second day of May the evidence was submitted and argument heard and leave taken to file briefs.

The alternative writ alleges the incorporation and extent of the said railway; that Louis Houck was and is its president and general manager and the owner of a majority of its stock; that Alexander Ross is the judge of the Cape Girardeau court of common pleas, and that said court is a court of limited jurisdiction,

created by an act of the legislature, approved February 23, 1851 (Acts of 1850, 1851), and an amendatory act approved February 2, 1853 (Acts of 1852, 1853, p. 80). It then avers that Eli Klotz was appointed receiver of said railway on the third day of March, 1893, by the Hon. John G. Wear, judge of the circuit court of Stoddard county, Missouri, in vacation, in a certain cause wherein E. G. Merriam is plaintiff, and the said railway company, Leo Doyle, trustee, and the Mercantile Trust Company are defendants, then pending in said Stoddard county circuit court ond returnable to the fall term thereof for the year 1893; that afterwards said provisional appointment, made in vacation as aforesaid, was duly confirmed by the circuit court of Stoddard county on March 13, 1893; that in pursuance of said appointment the relator duly qualified as such receiver by taking the oath and filing his bond as such; that he demanded of said Louis Houck, the president of said railway, the possession thereof, but said Houck refused to deliver the same, claiming that he had been duly appointed receiver himself on the fourth day of March, 1893, by Hon. Alexander Ross, judge of the Cape Girardeau court of common pleas, in a suit in said court, wherein said railway company was plaintiff, and Leo Doyle, Edward Hidden and the Mercantile Trust Company of New York are defendants; that he had qualified under said appointment and had taken possession of said railway by virtue thereof.

It is then averred that relator appeared in said Cape Girardeau court of common pleas and exhibited to Judge Ross a copy of his appointment by the circuit court of Stoddard county and suggested that Judge Ross had no jurisdiction to appoint said Houck, because of the prior proceedings in the circuit court of Stoddard county, and because said common pleas court had no jurisdiction over equity cases, especially

such a case as is set forth in the bill filed by said railway company against said Leo Doyle *et al.*, in which said Houck was appointed receiver. The said bill is copied in full in the writ, and it is unnecessary to repeat it here.

It then appears that Judge Ross declined to take any action at the time, but in vacation continued the hearing till the May term of his court, to which relator excepted at the time.

It then avers that the petition in the Cape Girardeau court of common pleas does not state facts sufficient to constitute a cause of action. The writ then avers that relator is thus unable to obtain possession of said railway and prays this court to command the respondents to show cause why they should not be directed by this court to turn over said property to him.

The returns of the railroad company and other respondents aver the order of the Stoddard circuit court appointing relator Klotz receiver, was annulled on March 13, 1893, by that court; that he never had possession of the railroad, but that Houck, receiver, always has had since his appointment and qualification; that the common pleas had, and has, jurisdiction; that its judge, the respondent, Ross, has so adjudged, and in his orders and proceedings under the bill named had acted *judicially*, and is proceeding in due course to hear and determine the same, and all questions in relation thereto as the same may arise; that Klotz, pretending to be a receiver, appeared in this common pleas court on that proceeding and filed a petition for possession, which was ordered filed and continued to the May term, 1893, and is there now pending. This return also sets forth, as a separate defense, that the mortgages under which Merriam claims to hold the bonds, the coupons of which are not paid, and because

whereof he begins suit, cover only twenty-five miles of this whole road of which it has been attempted to give Klotz, as receiver, possession, which road is one hundred miles long; that, of the twenty-five miles covered, only five are in Stoddard county; and the bill seeks not a foreclosure, but that the road may be "sequestered for payment of interest heretofore accrued and that may hereafter accrue, and a receiver appointed to take possession and operate the railroad as a unit," and for general relief. This portion of the return also states the provisions of each of these mortgages to the effect that the bonds do not mature until 1901, but that, if interest was not paid, the trustee therein (Leo Doyle) should, on demand of holders of not less than one-fourth of outstanding bonds thereunder, take possession of the road as far as covered by the mortgage and operate the same for bond holders; and that it was in said mortgages expressly provided that nothing therein could be construed to affect or put any burden or liability on the right of way, bridges, property or lands acquired or to be acquired on or along (in the first mortgage) the Lakeville division of the road, extending from the (Delta) junction to Lakeville or beyond that point, and (in the second mortgage) on or along the roadway lying and being southwest of Lakeville, or any donation or gift made to aid the road. And the return avers and claims, on the facts stated, that an order taking the whole road under the circumstances and contracts just mentioned, is in violation of the several constitutions of the state of Missouri and of the United States, declaring that no person shall be deprived of property without due process of law, which guarantees are relied on and invoked by respondent.

This return further sets forth the proceedings on the thirteenth of March, 1893, in the Stoddard circuit

court in the Merriam suit, when this respondent, as well as Leo Doyle, filed its motion to annul the order appointing Klotz receiver, and for a change of venue; and that on that day the circuit court was open, and the court then and there having fully considered the matter vacated the appointment of Klotz, relator herein, and that the court was then adjourned to the next term in course by the legal and acting judge, who had up to that time been holding the term; and that the pretended order confirming the appointment of Klotz, set up by relator, was illegally entered after said adjournment and is void.

The relator's answer to this return is aimed at this last averment and sets forth the original order of March 3, 1893, of Klotz's appointment, and ordering the clerk to issue a summons and notice to defendants therein, to appear before the circuit court at Bloomfield on March 13, and show cause why said order appointing Klotz receiver should not be confirmed; that the railway company and Doyle did appear, and filed motions to vacate the receivership and for change of venue; that George Houck pretended to exercise the functions of the temporary and provisional judge, conspired with Louis Houck and his attorneys to fraudulently circumvent the confirmation of receiver Klotz, knowing Judge Wear was on his way to hold court pursuant to notice, and convened court at eight o'clock, and although motions were required to be filed one day, Houck, judge, sustained said motion, and did immediately pretend to adjourn said court, and conspirators fled the town, but Judge Wear, circuit judge, did convene said court and did on investigation of the minutes enter an order as follows:

"Monday, March 13, 1893, the seventh day of March term, 1893. Court opened as usual, pursuant to adjournment, the Hon. John G. Wear, judge of the

circuit court of this county, presiding pursuant to notice duly made to the clerk and sheriff of this court. It appearing to the court that prior to convening at the usual hour and pursuant to the aforesaid notices, that one George Houck, assuming to exercise the functions of a judge of this court, had, at an unusual hour, and with knowledge of the notices given that I, as judge of said court, would be present and open the court at the usual hour, and knowing that I as said judge was in the county and on my way to hold the same, did contrive with the attorneys for the St. Louis, Cape Girardeau & Fort Smith Railway Company, and the president of said company, Louis Houck, the brother of George Houck, to defeat the hearing of an application for the confirmation of a receiver heretofore by me, in vacation, appointed in the case of E. G. Merriam against the said St. Louis, Cape Girardeau & Fort Smith Railway Company *et al.*, due notice of which had been given to be heard before me on this day, did attempt to fraudulently and conclusively convene said court and to make certain orders in said cause at an unusual hour, and did make orders dismissing the receiver appointed by this court upon the pretended motion of the defendants in said cause, although the same had not been docketed, and was not returnable until the December term of this court, and other orders therein, and did immediately attempt to adjourn the court. It is now ordered in view of said fraudulent purpose and want of authority in said Houck to hold this court, this day, that all minutes heretofore made this day, by said George Houck, while pretending to act as judge of this court, be expunged and stricken from the record, and all proceedings pretended to have been made in this court by said George Houck as pretended judge on this day is also stricken and expunged from the docket.''

The respondents have replied to this that Houck, judge, was elected for the term under the statute in such case at the commencement of the term legally, and had held court from day to day, that would otherwise have lapsed, and having on the eleventh of March adjourned to the thirteenth at eight o'clock A. M., and said motions coming on to be heard in due course, disposed of the same, by vacating the receivership order and continuing the motion for change of venue and the cause to the next term; that he, George Houck, was the lawful and acting judge for the term and Judge Wear was without authority to act as he pretended to act, as set forth by relator; that there was no conspiracy, and the motion to vacate was sustained as it ought to have been, and the record and minutes are pleaded in support of this response.

This statement so far covers substantially the averments in pleadings filed and offered to be filed.

There is a large volume of parol testimony taken by the special examiner, and filed in the cause, and much documentary evidence filed on both sides. By this evidence the following facts appear: On the third day of March, 1893, the suit of Merriam v. The St. Louis, Cape Girardeau and Fort Smith Railway was filed in the office of the clerk of the circuit court of Stoddard county, and simultaneously the order of Judge Wear appointing the relator receiver. That order contains the following provision:

"*Twelfth.* This order is a provisional one made by the undersigned judge in vacation, and it is hereby ordered, that the clerk of the circuit court of Stoddard county Missouri, issue a summons or notice to said defendants, returnable on Monday the thirteenth day of March, 1893, to appear at Bloomfield in said Stoddard county, before the circuit court of said

county and show cause if any they have, why the appointment of said receiver should not be confirmed.

"(Signed)                JOHN G. WEAR,

"Judge 22d Circuit."

By the statutes of this state the spring term of the Stoddard county circuit court was required to convene on the first Monday in March, 1893. Laws of Missouri (extra session) 1892, p. 13, sec. 50. Said first Monday was the sixth day of March, 1893.

The record of that court on the first day of said March term begins with the following convening order:

"The Hon. John G. Wear not being present to hold this court, and having failed to procure another judge to hold said court, a special election was held by the clerk of this court, at which the Hon. George Houck was duly elected special judge, there being more than five members of the bar present, to-wit, H. H. Bedford, W. F. Ford, Thomas Conley, C. L. Keaton, Ralph Wammick, William Kitchen and others, and the Hon. George Houck possessing all the qualifications of a circuit judge, took the oath of office and entered upon the duties as such." Again, there is no controversy between counsel as to these facts.

The said special judge held said court and disposed of the business from the sixth of March down to and including the morning hour of March 13, 1893. The record shows that on Monday, sixth of March, he adjourned court to Tuesday at nine o'clock in the morning. On Tuesday, he adjourned court until eight o'clock Wednesday morning. On Wednesday, he adjourned court to half past eight o'clock Thursday morning. On Thursday he adjourned court to eight o'clock Friday morning. Friday, he adjourned court until nine o'clock Saturday morning. On Saturday,

after transacting the business of the court, he adjourned the court until eight o'clock Monday morning. On Monday morning the record shows the court convened pursuant to adjournment, "Hon. George Houck, judge," etc.

On that morning, among other entries, appear the following:

"State

v.

"Napoleon Hickson.

"Arraigned. Plea of guilty on count of larceny. Count of burglary dismissed. Sentenced to the penitentiary for two years at hard labor. Ordered that sheriff convey him there with all convenient speed."

"E. G. Merriam

v.

"St. Louis, Cape Girardeau & Ft. S. R'y Co.

"Motion to vacate order filed."

"E. G. Merriam

v.

"St. Louis, Cape Girardeau & Ft. S. R'y. Co.

"Separate motion of Leo Doyle, trustee, limiting his appearance in this court for the purpose of the motion asking this court to vacate the order made by the judge of the court in vacation on March 3, 1893, appointing Eli Klotz, receiver of the St. Louis, Cape Girardeau & Fort Smith Railway Company, for the reasons filed. Which motion being submitted, taken up and heard and considered is in all things sustained; said order is vacated and held for naught."

"E. G. Merriam

*v.*

"St. Louis, Cape Girardeau & Ft. S. R'y Co., *et al.*

" Separate motion of the St. Louis, Cape Girardeau & Fort Smith Railway Company, limiting its appearance in this court for the purpose of his motion, asking this court to vacate the order made by the judge of this court in vacation on March 3, 1893, appointing Eli Klotz receiver of the St. Louis, Cape Girardeau & Fort Smith Railway Company, for reasons filed, which motion being submitted and by the court taken up, heard and considered is in all things sustained, said order is vacated and held for naught."

"E. G. Merriam

*v.*

"Leo Doyle, trustee, *et al.*

"Application for change of venue filed and cause continued."

"E. G. Merriam

*v.*

"St. Louis, Cape Girardeau & Ft. S. R'y Co., *et al.*

"Application for change of venue filed and cause continued."

"Ordered by the court that all business pending and undisposed of be, and the same is hereby, continued until the next regular term of this court, and the court adjourned until court in course."

"GEORGE HOUCK,
"Special Judge for March term, 1893."

After the special judge had adjourned the court. Judge Wear arrived at the county seat that morning, and, finding that Judge Houck had adjourned, he repaired to the court house, and caused the entry hereinbefore copied in full in relator's answer, to be spread on the record, by which he assumed to expunge and set aside the record made by Special Judge Houck.

Two positions are assumed by the learned counsel for the relator, as to the proceedings on Monday, March 13. They claim first, that Special Judge Houck had no right to adjourn the circuit court of Stoddard county, before Judge Wear arrived on the thirteenth of March. They base this claim upon some kind of informal notice that Judge Wear would be present, that morning, or some promise on the part of Mr. Houck to Judge Wear to hold the court open until Judge Wear should arrive. It must be borne in mind that this record on its face affirmatively shows that the *occasion* had arisen within the contemplation of the laws of this state, when the bar of Stoddard county were authorized to elect a special judge. Moreover, it clearly appears that the requisite number of lawyers were present to elect the judge; that the proper officer, to-wit, the clerk, held the election; that the person elected had all the qualifications of a circuit judge; that he was elected, and took the oath required by law, and entered upon the discharge of his duties as judge.

Can it be questioned he was now the judge both *de jure* and *de facto* of that court? We think not. Nor do counsel deny this up to Monday morning, the thirteenth of March, but their contention is that at some point of time between the adjournment Saturday evening, and the convening of the court Monday morning, this special judge's commission expired, by virtue of a contract, express or implied, with Judge Wear, and that all the acts of the court that morning before

Judge Wear arrived must be by us held for naught in this proceeding, because a violation of that contract or was the result of a fraudulent conspiracy. The position of the learned counsel, in short, amounts to this: That a special judge is under some obligation to the regular judge; is under some kind of an implied contract to do just what the regular judge should desire, and nothing else. It must be evident upon consideration that no such principle has any foundation in our laws, or the principles underlying our form of government.

The very essence of the judicial office is that the incumbent thereof shall be independent, and owe allegiance only to the law of the land. If a regular judge, he derives his title by election, or executive appointment. If a special judge, under our statute, to an election by the bar of the court. When he qualifies by taking the oath of office, he must act under a sense of high responsibility to the public alone and the law of the land. No other security for his good conduct can be, or is, exacted. The law of this state, recognizing that a special judge is sometimes necessary for the transaction of the public business, has provided when and how he shall be selected. The legislature, we think, rightly considered that, if a judge at all, he should be invested with all the authority necessary to command and enforce that respect due to the responsible position of a judge, hence it provided by section 3326, Revised Statutes, 1889, that "the person thus elected *shall, during the period he shall act, have all the powers and be liable to all the responsibilities of the circuit judge.*"

Some discussion was had during the argument whether this election of a special judge could be chosen for a whole term, or only until Judge Wear should return, and whether a special judge could be chosen for

a whole term so as to deprive the regular judge, of his right to preside should he appear in court, and seek to resume his duties. The facts of this case do not require us to pass upon that question. George Houck, Esq., was elected because Judge Wear *was absent*, and he did not attempt to hold the court at any time when Judge Wear was present. That a regular judge may adjourn his court at any time he sees fit, and that his reasons therefor cannot be assailed in a collateral proceeding, we take it, needs no argument or reason to support it. This necessarily results from the nature of his office. If a regular judge might have adjourned the circuit court of Stoddard county on Monday, March 13, at nine o'clock in the forenoon, then Special Judge Houck could do so. He, was the judge of that court and did adjourn it, and that action terminated the March term, 1893. The claim that there was an agreement between Special Judge Houck and Judge Wear outside of the court cannot be permitted to affect the rights of suitors in that court. The courts of record of this state speak by their records and such conventions as were offered to be shown in this case, are not competent to affect the integrity of the record. Upon the clearest principles of public policy no such proof is allowed to impeach the verity of the record in this collateral proceeding. *Mobley v. Nave*, 67 Mo. 546.

Secondly, it is argued that George Houck was incompetent by reason of his relation to Louis Houck to sit in the determination of the motions vacating the receivership of relator. Our statute, section 3247, Revised Statutes, 1889, reads: "No judge of any court of record, who is interested in any suit or related to either party, or who shall have been of counsel in any suit or proceeding pending before him, shall, without express consent of the parties thereto, sit on the trial or determination thereof." It is not claimed by coun-

sel that George Houck had any pecuniary interest in the suit of Merriam *v.* The Railway Company, or that he had been of counsel in said suit, or that Louis Houck was a party to said action. On the face of the record he was clearly not incompetent by virtue of this statute; but it is argued that as Louis Houck was a stockholder in the railroad, this disqualified George Houck.

The contention of relator is that his action is void. If voidable or erroneous only, it does not fall within our jurisdiction in this proceeding to entertain it. The effect of a disqualification of a judge by reason of relationship to the parties to an action, has often been adjudicated in the courts of the several states and the rule obtaining in a majority of the states is that such a judgment is voidable only, and not absolutely void. Especially is this true in those states which, like Missouri, have statutes permitting the parties to waive an objection of this character. *Fowler v. Brooks*, 64 N. H. 423; *Phillips v. Eyre*, L. R. 6 Q. B. 1–22; *Trawick's Heirs v. Trawick's Adm'rs*, 67 Ala. 271; *Rogers v. Felker*, 77 Ga. 46.

The position of counsel for relator leads to this conclusion. They would have this court in this *mandamus* proceeding determine that the record made by Special Judge Houck is not true and that he was a usurper when he made it; but, as he was the judge of that court, we know no reason why the record he made should not be accorded the same presumption of verity that is universally shown to the records made by other courts within their jurisdiction. We have heretofore, so held. *Green v. Walker*, 99 Mo. 68; *State v. Gamble*, 108 Mo. 500.

But it is asked how else can the fraudulent conspiracy be shown. We answer, by a direct proceeding for that purpose. The circuit court of Stoddard county has original jurisdiction to hear and determine whether

the action of Special Judge Houck was tainted with fraud or corruption; but, most clearly, this court has no jurisdiction to determine that fact in this collateral proceeding. That *mandamus* will not lie for such a purpose we think is well settled. *Dixon v. The Judge*, 4 Mo. 286; *State ex rel. v. Young*, 84 Mo. 94; *State ex rel. v. Smith*, 105 Mo. 9.

Having reached the conclusion that the record made by Special Judge Houck could not be questioned by this proceeding and in this way, and that record having shown that the circuit court of Stoddard county had adjourned till the regular September term, it follows that the action of Judge Wear in attempting to reconvene that court on the day after it had been adjourned by Judge Houck, *was unauthorized and of no binding effect upon anybody.* His proceedings on their face disclose their own infirmity, and the minutes of the court, and the adjourning order signed by Special Judge Houck, as required by section 3231, Revised Statutes, 1889, fully corroborates the undisputed fact that the term had been finally adjourned by the said special judge.

Was there any power in Judge Wear to reopen court, and hold it, under these circumstances? We take it that it is immaterial whether Judge Houck ought to have waited or not. Inasmuch as he did adjourn the term, could Judge Wear reopen the court again as a part of the regular March term? The judicial power in this state can only be exercised at the times and places prescribed by law. Accordingly the statutes have, with great particularity, specified the day on which each court, whether circuit, county, probate or supreme court, shall meet. Out of abundant caution it is provided that, if the judge shall be detained, the sheriff may adjourn the court till the third day, when if the judge is still absent he may adjourn to the next

regular term, and it is provided that the courts may upon notice call special terms, but the whole scope of the legislation on this subject as well as the common law, is to the effect that only at the stated times, and at the places specified, can a court lawfully meet. Revised Statutes, 1889, sections 3248, 3249, 3250.

The mere coming together of the judge, and the other officers of the court, unless at a time fixed by law or on a day to which the court has been lawfully adjourned, does not constitute a court under our laws. Freeman on Judgments, section 121, and cases cited. This is so clear that we doubt whether any court or lawyer ever questions it. *Galusha v. Butterfield*, 2 Scam. 227; *Brumley v. State*, 20 Ark. 77; *Dunn v. State*, 2 Ark. 229, *Stoval v. Emerson*, 20 Mo. App. 322.

Again and again this court held that, after a term closes, the judge nor the court has any power to change a judgment or entry. An adjournment to the next regular term concludes all further action by the officers at that term. *Ashby v. Glasgow*, 7 Mo. 320; *Hill v. St. Louis*, 20 Mo. 584; *Harbor v. Railroad*, 32 Mo. 423; *Van Dyke v. State*, 22 Ala. 57. It follows that the averment that the circuit court of Stoddard county confirmed the additional appointment of relator as receiver on March 13 is not sustained by the record and the evidence. Counsel, anticipating this, asked leave to amend their petition and writ by averring that the judge confirmed the appointment; but this amendment is earnestly opposed. In the view we take of the evidence, the amendment will not help relator. It is very evident that Judge Wear was not attempting to exercise his authority as a judge in vacation, but was attempting to hold a court. This is his own positive declaration. As already said, his acts as a court were clearly void, and this proceeding cannot now be upheld as the act of a judge in vacation.

The respondents were brought into court to answer to a record. They tendered the issue *nul tiel* record and have sustained it. The provisional order of March 3, 1893, having been vacated, and the order of March 13, by Judge Wear, confirming it being void, the relator's title as receiver was destroyed, and he had no right to demand and take charge of said railroad.

Having reached this conclusion, it becomes unnecessary to pass upon the other important questions discussed by counsel, such as the jurisdiction of the Cape Girardeau common pleas court, and the conflict of jurisdiction between that court and the Stoddard circuit court. A decision of those questions will be deferred until a case is made 'calling for their determination.

The peremptory writ is denied, and the proceeding is dismissed at the cost of the relator, including the compensation of the special examiner, John W. Dryden, Esq., and the fees of the witnesses, and it is adjudged that respondents have execution therefor. All concur, except SHERWOOD, J., who dissents.

SHERWOOD, J. *(dissenting).*—I was unable to concur in the first opinion delivered in this cause, and am equally unable to concur in the present one, which differs in some particulars from the one now delivered. Owing to the importance of the principles involved, I have thought it best to give some expression to my views and to the reasons why I cannot agree to what has been said in the majority opinion.

And, first, as to the priority of jurisdiction; which court acquired it?

That the petition of Merriam was prior in point of time as to its filing, stands admitted; and it has recently been determined by this court that a suit is brought within the meaning of the statute when the

petition is filed. *Lumber Co. v. Wright*, 114 Mo. 326. On the same day of the filing of the petition in this case a provisional order was made appointing relator receiver; this was on the third of March, 1893. Touching these questions of priority, a well known text writer says: "These questions have usually been determined upon principles of comity, and it is now the established doctrine of both the state and federal courts that that court, whether state or federal, which first acquires jurisdiction of the subject-matter, or of the *res*, and which is first put in motion will retain its control to the end of the controversy, and the possession of its receiver will not be disturbed by the subsequent appointment of a receiver by the other court. Nor is it necessary, in the application of the general doctrine here stated, that the court asserting its exclusive control by reason of having been first to take cognizance of the subject-matter, should be the first to take actual possession of the property by its receiver." High on Receivers [2 Ed.], sec. 50.

The same view is taken in North Carolina. On February 10, 1880, a bill was filed for the appointment of a receiver, and on the same day a preliminary motion looking to the appointment of a receiver and for an injunction was filed. This motion, postponed from time to time, was finally acted on on the fifteenth day of June next thereafter, and a receiver appointed. Pending this application, and on March 31, 1880, Roberts, an alleged judgment creditor, filed a bill in another court of that state, for the like purpose of securing the assets of the road by the appointment of a receiver for the same property. On the ninth day of April the bill last filed was heard and receiver appointed. Thereupon it was claimed that the receiver first appointed had the prior right of possession of the property,

because of said priority of appointment, but the court said:

"The prior jurisdiction over the subject-matter acquired by the present action and the pending and undecided motion for an injunction and a receiver, exclude the interference of the court in another, and especially at the instance of one who is competent to become a party in the first, and to obtain adequate redress in that. The authorities are decisive on the point, and the conflicts and perplexities attending the prosecution of several actions having the same object in view, are in ample vindication of the principle." And the appointment of the receiver first appointed was held invalid. *Young v. Rollins*, 85 N. C. 485; s. c., 12 American and English Railroad Cases, 455.

Another text writer, in circumstances like the present, states the prevalent rule thus: "The general rule is well understood to be that the court which first takes cognizance of the controversy is entitled to retain jurisdiction until the end of the litigation, and incidentally to take possession of the subject-matter of the controversy to the exclusion of all interference by other courts of concurrent jurisdiction, both in relation to the disposition of the subject-matter of the action, the commencement of suits against the receiver without permission, and the general control and removal of the receiver. All attempts to interfere with the property involved without permission of the court first acquiring jurisdiction, although done under color of legal process, may be treated as a contempt, and so punished." Gluck & Becker on Receivers, sec. 30, p. 66. To the same effect see Beach on Receivers, sec. 20, p. 21.

In *Maynard v. Bond*, 67 Mo. 315, this principle is distinctly declared, where it is said: "A receiver is said to be uniformly regarded as an officer of the court, exercising his functions, but for the common benefit of

all parties in interest. He is elsewhere spoken of as 'the hand of the court,' and the property or fund entrusted to his care is regarded as in *custodia legis*, and that his appointment is in effect an equitable execution. High on Receivers, secs. 1 and 2, and cased cited. In *Steele v. Sturgis*, (5 Ab. Pr. R. 442), it is said: 'The counsel for the sheriff only objects that he was prior in right to the receiver, because his levy was made before the receiver had executed and filed the bond to be given by him. When the court in such cases appoints a receiver, it is because the court has first adjudged that the property is no longer to be under the control of the parties to the suit, but is thenceforth to be, and is, in the custody of the court. The receiver then becomes merely an agent through whom the court acts; and whether he be forthwith appointed by the court, as in this case, or a reference be made to a master or a referee to appoint one, in either case the effect is the same; the title of the receiver is of the date at which it is ordered that a receiver shall be appointed.' We incline to the opinion that a receiver's appointment should date from the time the order is entered, regarding this view as better sustained by reason, as it certainly is by authority, and we the more readily incline to this view because, if upheld, it will greatly tend to prevent any unseemly conflict of jurisdiction, and because, further, the party claiming an adverse interest may appeal to the court appointing the receiver for leave to take the necessary steps to protect their interest."

A forcible illustration of the same principle is found in the case of *Union Trust Co. v. Railroad*, 6 Biss. 197. A suit was brought in the United States circuit court for Illinois by the Union Trust Company against the Rockford, Rock Island & St. Louis Railway Company, in which, among other things, the appointment of a receiver was asked. At the July term, 1874, a

general demurrer was interposed to the bill, which, being sustained, the bill was dismissed on the twentieth of July.   On the twenty-second of July a bill was filed in the state court against the same defendant, Mr. Nickerson, asking for a receiver, and one was accordingly appointed.   On the twenty-fourth of July, the complainant, in the federal court, asked to set aside the judgment of dismissal with leave to amend and file a supplemental bill, which was granted, and a receiver was subsequently appointed by the federal court.   The court said: "It will hardly be necessary to cite authorities to show that it is, and has long been, the settled rule of law in all cases of conflict of jurisdiction, that the court which first takes cognizance of the controversy is entitled to retain jurisdiction to the end of the litigation, and incidentally to take possession of or control the *res*, the subject-matter of the dispute, to the exclusion of all interference from other courts of co-ordinate jurisdiction.   *Bell v. Ohio L. & T. Co.*, 1 Biss. 260;  *Riggs v. Johnson County*, 6 Wall. 166;  *Bill v. Railroad*, 2 Biss. 390;  1 Abbot's United States Practice, 223, and cases cited.   The proper application of this rule does not require that the court which first takes jurisdiction of the case shall also first take, by its officers, possession of the thing in controversy, if tangible and susceptible of seizure; for such a rule would only lead to unseemly haste on the part of officers to get the manual possession of the property; and while the court first appealed to was investigating the rights of the respective parties, another court, acting with more haste, might, by a seizure of the property, make the first suit wholly unavailing.   To avoid such a result, the broad rule is laid down that the court first invoked will not be interfered with by another court while the jusisdiction is retained."   In accordance with this ruling, the receiver appointed by the state court was displaced.

In *Gaylord v. Railroad*, reported fully in a note to section 50 of High on Receivers, Judge DRUMMOND in an elaborate and exhaustive opinion admirably discusses the question in hand and approvingly cites the opinion in 6 Bissell, *supra*.

Again, in the case of *Heidritter v. Elizabeth Oil Cloth Co.*, 112 U. S. 294, Mr. Justice MATTHEWS, in delivering the opinion of the supreme court of the United States, says: "The rule simply requires, as a matter of necessity, and, therefore, of comity, that when the object of the action requires the control and dominion of the property involved in the litigation, that court which first acquires possession, or that dominion which is equivalent, draws to itself the exclusive right to dispose of it, for the purposes of its jurisdiction. And it is also said in that case that "the mere bringing of a suit in which the claim is sought to be enforced, may, by law, be equivalent to seizure, being the open and public exercise of dominion over it for the purposes of the suit."

In the case of *Boswell's Lessee v. Otis*, 9 Howard (U. S.), 336 (cited and approved in 112 U. S. 301), it is distinctly held that the filing of a bill in equity claiming specific property or rights and equities in specific property described in the bill, gives the court jurisdiction over such property and suit, although these is no attachment, and that such a suit is substantially a proceeding *in rem*, and the property so described is within the dominion and control of the court, and its judgment in relation to such property even upon constructive service process, is valid and binding upon the parties and the property. The court says: "It is immaterial whether the proceeding against the property be by an attachment or bill in chancery. A bill for the specific execution of a contract to convey real estate is not strictly a proceeding *in rem*, in ordi-

nary cases; but where such a procedure is authorized by statute, on publication, without personal service of process, it is, substantially, of that character."

In *Barton v. Barbour*, 104 U. S. 126, it was held that a suit without leave of the court having prior jurisdiction, did not only subject the plaintiff to liability to be attached for contempt, but was a jurisdictional fact, and it was there held that the court which subsequently undertook to exercise control over the *res* involved in the first suit had *no jurisdiction* to entertain the second suit.

Other authorities collected by the industry of counsel for relator, are of the same import; it is unnecessary to cite them. They establish in the clearest possible manner that, in circumstances similar to those in the case at bar, the court which *first takes cognizance of the controversy*, acquires, in consequence thereof, *incidental control and right to the possession of the res* embraced within that controversy; a control that no other court of co-ordinate jurisdiction can trench upon, or has the power or authority in any way to interfere with or to entertain any proceeding in any manner affecting that controversy or *res*.

Applying the principles already announced to the present case, no doubt, it would seem, can be entertained but that the Stoddard circuit court having first taken cognizance of the controversy, could retain its jurisdiction over the *res* to the exclusion of every other other tribunal.

Nor does it matter that notice of the rule to show cause on the thirteenth of March had not been served at the time the provisional order appointing Klotz receiver was made. The authorities show that while, as a general rule, courts will not entertain an *ex parte* application until notice be given to parties interested or a rule to show cause, yet it seems that courts have

*jurisdiction* to make such appointment without notice, etc., notwithstanding it would be erroneous to do so, unless in very peculiar circumstances. High on Receivers, sections 111, 112 *et seq.*

In the present instance Judge Wear pursued the precise course pointed out by the authorities when making the provisional order; he made a rule to show cause returnable on the thirteenth of March. But the fact that the notice or rule had not then been served when the provisional order was made or filed, does not abate by a single jot or tittle the previously acquired jurisdiction of the Stoddard circuit court. Were the rule otherwise, the jurisdiction of the court would depend not upon its being the first to take cognizance of the cause, but upon the *fleetness of the officers* employed to serve adverse or antagonistic jurisdiction-seeking writs.

Besides, in this case process and the notice to show cause were duly served on the defendants on the seventh or eighth of March, and a notice mailed to a nonresident defendant within a reasonably prompt time. More than that, the railway company is the only one as to whom or through whom conflicting interests or adverse rights are asserted, or prior jurisdiction claimed to exist in the common pleas court of Cape Girardeau county, and in reference to this point it appears that, as to Louis Houck, the president of that railway company, he had *actual* notice of the filing of the bill in the Stoddard circuit court, and the particulars sent him by his brother George, through two telegrams sent by the latter on the fourth of March, and thereupon the bill under which Louis Houck was appointed, was by him immediately filed, and he himself appointed receiver of his own road, in which he owned the large majority of the stock.

Where actual notice in thus found to exist it is as

effective as though service of process had occurred. Recurring to the case in 6 Bissell, *supra*, it is there said: "The solicitors of Nickerson had notice of the motion to amend in this court, and, under the facts in this case, Nickerson is chargeable with notice of the action of this court in the premises, and that this court had resumed jurisdiction of the suit before he took his order appointing a receiver. Nickerson was not a stranger to this suit. He had appeared by his counsel on the argument of the demurrer, and resisted the complainant's suit, although not technically a party to the record. He was then chargeable with actual, as well as constructive, notice that this court might, at any time during the July term, set aside its judgment on the demurrer and proceed with the case."

On this point an author already quoted says: "It is also a well established principle, that, to render a defendant or other person liable by attachment for contempt in disturbing or interfering with property of which a receiver is entitled to possession, it is not necessary that he should be officially apprised of the receiver's appointment, or even that the formal order should have been actually drawn, provided he has actual notice of the receivership, or of the order of court directing the appointment. Any actual knowledge of the granting of the order is sufficient to fix defendant's responsibility for its violation, the same principle being applicable in such cases as in case of the violation of an injunction. Thus, where defendants have knowledge of the granting of an injunction against their disposal of certain property, and the appointment of a receiver over the property, they are in contempt of court if they dispose of it, even though the order of the court is not yet served upon them. And where a defendant is present in court during the hearing of a cause, and knows that an order granting

a receiver of his estates has been allowed, although the decree itself has not yet been drawn, he is guilty of a contempt of court if he removes a portion of the property and puts it beyond the receiver's possession for the purpose of evading the decree, and he cannot justify on the ground that the decree has not yet been entered." High on Receivers, sec. 166, and notes. The same law prevails as to injunctions. High on Injunctions, sec. 17.

It seems clear from these authorities that Louis Houck was in contempt of the Stoddard circuit court when he filed his bill in the Cape Girardeau common pleas court. If so, how is it possible for a person to occupy the anomalous attitude of being *in contempt* of *one* court for doing the very same act which confers priority on him in *another?*

II. But the Cape Girardeau court of common pleas had no jurisdiction to appoint Louis Houck receiver, for the further reason that the petition filed for that purpose states no grounds whatever for such an action. Nor could such a ground be stated in the circumstances set forth. Subjected to analysis, the bill, after setting out the mortgage and floating indebtedness, substantially alleges:

"*First.* That the company is unable to pay its debts; that it has been so for many years; that claims for unpaid interest amounting to $250,000 are now being pressed against it.

"*Second.* That certain persons, with small claims to it unknown, are endeavoring to secure control of the property of the company by expensive and useless litigation.

"*Third.* That certain creditors, to it unknown, are about to bring suit against the petitioner, and otherwise harm it and the great body of its creditors.

"*Fourth.* That such suits will impair the value of

the property and injure the stockholders and creditors as a body.

"*Fifth*. That the petitioner company is willing to pay its debts, and has sufficient property to do so, and will do so, if given time.

"*Sixth*. That the purpose of such litigation is to greatly injure and destroy the value of the petitioner's property."

Except in a suit pending, a court of equity has *no jurisdiction* to appoint a receiver; such an appointment is always *ancillary* to a bill pending between *adverse* parties. It is never made on the *ex parte* application of an insolvent corporation calling upon a court of equity to administer its assets; a court of equity has no such power. This is abundantly shown by the authorities. Thus, in *Jones v. Bank*, 17 Pac. Rep. 272, the question was whether Trimble, appointed on the petition of the debtor, was a legal receiver, or whether a mere stranger to the suit and having no standing in court, and therefore no right to contest the validity of certain attachment proceedings. In passing upon the question whether Trimble took any title as receiver under the proceedings of the bank, the court said: "This brings us to the examination of the propriety and legality of his appointment as receiver; and requires a construction of the provisions of subdivisions one and three, section 141, and of section 142, Code of Civil Procedure. Subdivision one provides that a receiver may be appointed, 'before judgment, provisionally on application of either party, when he establishes a *prima facie* right to the property, or to an interest in the property, which is the subject of the action, and which is in possession of an adverse party, and the property, or its rents and profits, are in danger of being lost, or materially injured or impaired.' Subdivision three, that a receiver may be appointed 'in

such other cases as are in accordance with the practice
of courts of equity jurisdiction.' Section 142 provides
that 'the application for the appointment of a receiver
shall be made by filing a petition, at any time, in the
action in which a receiver is desired, setting forth the
facts upon which the application is based; which peti-
tion shall be verified as complaints are required to be
by this act. And the party opposing the appointment
of a receiver shall do by filing an answer to the peti-
tion, verified as answers to complaints are required to be
by this act.' If these provisions are anything more
than a codification of the law and practice governing
the appointment of receivers before this enactment, it
is difficult to perceive where the difference lies; and, to
determine to what facts the court will apply this stat-
ute, we are compelled to look to the practice and law as
it was heretofore. Hitherto it has been the universally
accepted opinion that courts have no jurisdiction to
appoint a receiver, except in a suit pending in which
the receiver is desired, unless in cases of idiots, luna-
tics or infants, which, as Lord HARWICKE says in *ex parte*
*Whitfield*, 2 Atk. 315, is 'a particular jurisdiction.'
The doctrine is applied in *Baker v. Backus*, 32 Ill. 95;
*Davis v. Flagstaff*, 2 Utah, 92; *Hardy v. McClellan*, 53
Miss. 507; *Hugh v. McRae Co.*, Chase, 466; *French
Bank case*, 53 Cal. 550; *Kimball v. Goodburn*, 52 Mich.
10; *People v. Jones*, 33 Mich. 303, and High on Receiv-
ers, sec. 17, and cases cited in note. Our statute cer-
tainly contemplates the same thing. Its plain intent is
that there shall be a controversy between two or more
adverse parties in court, involving some conflicting
and hostile claims to property, that is, at least, in part,
the subject-matter of the litigation. It is evident that,
in the mind of the legislature, it was necessary to this
jurisdiction that there should be some party in all these
proceedings who was *adverse* to the defendant, and whose

rights to certain property were to be protected and adjudicated. It is impossible, by any process of reasoning, to construe the statute so as to make it apply to any case in which an action, in the ordinary definition of the term, is not pending.

"To hold that courts of equity can entertain jurisdiction to appoint a receiver of property, as the substantive ground and ultimate object and purpose of the suit on the petition of the owner of the property to be controlled and protected, would be to make them the administrators of every estate where the owners thereof were incapable or unwilling to administer them themselves. When Trimble was named by the court as receiver of defendant in error, no suit was pending against the bank; no one claimed to own or to have any interest in the specific property of the bank, except the bank itself; no one was before the court claiming a right to have the assets of the bank protected and preserved, until he could establish a right thereto adverse to that claimed by the bank. So far as is disclosed by the record, everyone admitted the full and complete ownership of all the property claimed by defendant in error to be in it. But, apparently fearing suits and attachments, defendant asked the court to become the custodian of its effects and property—in fact, its assignee for creditors. The court accepted the trust through Trimble as receiver. This it could not do. Such jurisdiction is not found in either the general powers of a court of equity, or in the statute referred to. If, therefore, there is no other warrant for this action of the court, the appointment of Trimble as receiver was void, and he had no authority in the premises, and no right to be heard to object to the attachment proceedings in this case."

A bill prayed an injunction to restrain an insolvent bank from continuing to do business and to wind

up its affairs, and, on this presentation of facts, Chief Justice CHASE said: "The court is not aware of any case which will warrant· its assuming the administration of the estate of a debtor simply upon the ground of insolvency. If such a case could be found, the court will be called upon to administer every estate where the debtor found himself unable to administer it himself conveniently. A creditor in a proper case might come into a court of equity for the appointment of a receiver, but a debtor could not; this, therefore, is not such a case as calls for the interposition of the court, and the prayer of the bill cannot be granted. It must be dismissed." *Hugh v. McRae,* Chase's Dec. 466.

In *Kimball v. Goodburn,* 32 Mich. 12, the supreme court of Michigan said, speaking of an alleged receivership: "But the order appears to have been made in a proceeding wherein the Bushwick company itself appears to be complainant, and we are aware of no case where a corporation in its corporate capacity and name can apply to be put in the custody of a receiver."

In New York, in the case of *Bangs v. McIntosh,* 23 Barb. 599, the supreme court held that the statute, (Revised Statutes, volume 2, page 463), authorizing the court, upon the petition of ·a judgment creditor of a corporation, to sequestrate the stock, property and effects of such company, and appoint a receiver had conferred new power on a court of chancery, saying: "Jurisdiction over corporations was expressly disclaimed by Chancellor SANFORD in the case of *The Attorney General v. The Bank of Niagara,* Hopkins Rep. 354, following the case of *The Attorney General v. The Utica Ins. Co.,* 2 John. ch. 371."

The supreme court of California in *Neal v. Hill,* 16 Cal. 145, said: "It is well settled that a court of

equity, as such, has no jurisdiction over corporate bodies for the purpose of restraining their operations or winding up their concerns. We do not find that any such power has ever been exercised in the absence of a statute conferring the jurisdiction."

In Michigan the statute has provided (Comp. L. 1871, ch. 206, 207) for the winding up of corporations. The Michigan court in *Railroad v. Judge*, 31 Mich. 456, said: "The directors or other board of management of a corporation having general authority to manage its concerns are vested by law with the only discretionary power that can exist in anyone to carry on the corporate business; and such management cannot be assumed by a court of chancery or vested in a receiver; neither can it be taken from the board, except under proceedings instituted to wind up the corporation under the statutes. * * * The appointment, *ex parte*, of a receiver to manage the corporate business, and the granting of an injunction in like manner on an interlocutory *ex parte* application whereby the control of the business is taken from the directors are more than irregular, and are absolutely void, as entirely beyond the power of the court; and are such an abuse as may be required to be corrected by *mandamus*."

Other authorities cited by counsel announce with emphasis the same conclusion. It is too plain for discussion that the bill in question is, in effect, merely one for the appointment of a receiver and calling on a court of equity to administer its assets—something entirely beyond the power of a court of equity to do, and, therefore, the act of the Cape Girardeau common pleas court should be held jurisdictionless and void. There are cases where amendments may occur to obviate defects in a petition, and thereby heal and cure radical defects; this is unquestioned; but this is not a case of that sort, for here, however much the allega-

tions of the petition may be turned, twisted or amended, it will still remain but the formulated endeavor of a *debtor* corporation on an *ex parte* application, where no adverse rights are being litigated to have a court of equity appoint a receiver, administer its assets and wind up its affairs.

The authorities already cited show the absolute nullity of the appointment of a receiver made in such circumstances. When this is the, case, the right to attack such an appointment collaterally, whenever and wherever its validity is asserted, is elementary law.

III. If the foregoing conclusions are correct, it is obvious that the receiver appointed by the Cape Girardeau court of common pleas has no standing in court. It now becomes necessary to ascertain the *status* of Klotz, the receiver provisionally appointed by Judge Wear; that he was lawfully appointed in the first instance has already been shown, and it may be further said on that point that the order in Klotz's case was not an *absolute* order, but only a *provisional one*, and, therefore, may be regarded as in the nature of a reference to a master to appoint a receiver, in which case under the authorities his appointment would date from the date of the provisional order; certainly so, if subsequently confirmed; and it will be presumed in any event—and this is in accordance with a very familiar presumption—that the clerk of the Stoddard circuit court did his duty, and filed the petition of Merriam *first*, and *then* filed the provisional order. *Long v. Joplin, etc., Co.*, 68 Mo. 422; *Lenox v. Harrison*, 88 Mo. 491; *Mathias v. O'Neill*, 94 Mo. 520. And this presumption is especially invocable here, because the order recited the filing of the petition and is founded upon it.

In Houck's case, however, it is conceded by one of his counsel, and testified to by clerk Engleman that his

petition, the order of appointment and bond were filed *simultaneously*. This admission does away, of course, with any such favorable presumption. But it seems to me that the rule is more technical than sound, and should not be allowed to prevail, when both petition and order are filed *eo instanti*. In support of this view the ruling of this court may properly be invoked that, if a motion for a new trial and one in arrest be filed at the same time, that the former shall, in its natural order, take precedence of the latter, and thus prevent a waiver which otherwise would occur. *McComas v. State*, 11 Mo. 117. But at any rate, if the rule is to prevail, it is as fatal to Houck's claim of receivership as to that of Klotz; with this exception, that the appointment of the latter was only *provisional* and was not complete until confirmed by the court. Gluck & Becker on Receivers, sec. 45. And in this respect this case differs, essentially, it would seem, from an *absolute* order of appointment, such as is spoken of in the cases which support the rule mentioned, and therefore the provisional order does not fall under the ban of that rule.

I am thus brought to consider the effect of the action of Special Judge Houck in setting aside on the thirteenth of March the provisonal order of Judge Wear, made on the third of that month appointing Klotz receiver. In discussing this point it is well enough to remark at the outset that the authorities are in conflict as to whether the acts of a judge disqualified by reason of relationship are void or only voidable. It may be conceded for the present purpose that his acts were of the latter character, so far as concerns disqualification because of *relationship*. As already stated, the rule or notice to show cause why the provisional order appointing Klotz receiver should not be confirmed, was made returnable March 13. This was merely a rule to

*show cause*, and the cause in which it was made had not been docketed, nor was it docketable or returnable until the following September term. The parties defendant *did not appear in response to the rule to show cause; they appeared* by independent and special motions for that purpose alone, and moved the vacation of the provisional order. These motions were *docketed at once, and at once taken up and granted.* This was done in plain disregard of that section of the statute which declares that "every direction of a court or judge, made or entered in writing, and not included in a judgment, is denominated an order, and an application for an order is a motion." Revised Statutes, 1889, sec. 2208. And in plain disregard, too, of another statutory provision requiring at least five days notice before the time appointed for the hearing of the motion. *Ib.* sec. 2035; *Henze v. Railroad,* 71 Mo. 643.

Even if the statute did not in terms require notice, the law would imply that notice was intended. *Wickham v. Page,* 49 Mo. 526; *Brown v. Weatherby,* 71 Mo. 152; *Laughlin v. Fairbanks,* 8 Mo. 370. And what the law will imply is as much part thereof as though set forth in the legislative enactment. *State ex rel. v. Board,* 108 Mo. 235.

These motions were *original independent* proceedings, and as relator was not in court in response to such motion, and as there was no notice given of them to the parties to be affected thereby, it follows that, if fundamental principles are not to be ignored, the action of the special judge in vacating the provisional order must be held a nullity, and therefore open to collateral attack. *Newton v. Newton,* 32 Mo. App. 162. "A sentence of a court pronounced against a party without hearing him, *or giving him an opportunity to be heard,* is not a judicial determination of his rights, and is not entitled

to respect in any other tribunal." *Windsor v. McVeigh*, 93 U. S. 277.

IV. The order of the special judge is otherwise assailable. There can be no doubt entertained, after one has read the evidence preserved in this cause, that the action of the special judge in vacating the provisional order made by Judge Wear, was the result of a *predetermined conclusion* on the part of the special judge *to do that very thing*; no other rational construction can be placed upon it. He tells Judge Wilson on Friday, next before Monday, the thirteenth of March, that he intended to adjourn the court on Monday morning to help out his brother Louis. This conversation is not denied by George Houck, and therefore stands admitted. *State v. Musick*, 101 Mo. *loc. cit.* 271.

George Houck had previously expressed himself to Judge Wear "that his brother's private fortune was in it (the litigation) and all he had was at stake," and he evidently felt, as it was natural he should, a great interest in the outcome of that litigation. He makes an arrangement with Judge Wear on Friday morning, that the latter go back home and then return to Bloomfield on Monday morning and take up the regular business of the term; he admits this after much evasion, and it is abundantly otherwise established that he did so. He announces to several lawyers in attendance that this would be the case, and on Friday he so informed the jury and excused them until Tuesday morning, and instructed them to return at that time. The evidence also shows that Judge Wear told him that on Monday he would take up the receivership matter; and he promises Judge Wear that the jury should be adjourned over to Tuesday morning. Now, of course, these agreements, made by and between the regular and special judge, could have no binding *legal* force or effect as all will concede; but whether they

were made or not is all important on the question whether *deception* was practiced and *fraud* was intended in making them.    And the facts aforesaid are over-whelmingly established, and that George Houck communicated these facts and this agreement to several members of the bar, who were interested in causes to be tried by the regular judge during the next week.

On Sunday, in response to a telegram which he received from his brother Louis, George Houck proceeds to Delta.    He says he disliked to go there, but under the urgency of the telegram he *felt forced to go*. Arrived there, he meets his brother and his brother's counsel.    He says when he met his brother Louis at Delta that the only conversation which passed between them in reference to the receivership was in response to these questions: "When were the papers filed in the Merriam case?    How did they come there?    Was the petition filed before the appointment was made?"    But this information, he admits, he had previously, in substance, communicated to his brother, and it seems singular, indeed, that such an urgent telegram should have been sent for the purpose of obtaining such unimportant information.

While at Delta, George Houck was in consultation with his brother's counsel "as to the condition of the court over there, and, possibly, what course was to be pursued."    During that consultation or while at Delta, George Houck "volunteered the information" to defendants' counsel that court at Bloomfield had been adjourned to meet at eight o'clock Monday morning. The parties then separated, Louis Houck returning to Cape Girardeau, and his counsel and his brother George returning to Bloomfield, arriving there Sunday evening, which they spend in George Houck's office, consisting of two rooms, into both of which the parties freely passed in and out, and during the course of the evening

George Houck came into the room where counsel were, and told them that he had made up his mind to *adjourn court early on the following morning*, and that if they had any motions to file, etc., they would have to be prompt in attending to it.    Motions were prepared on that evening to vacate the provisional order appointing Klotz receiver, and this was done with the view to have them passed upon by George Houck    The train from Poplar Bluff to Dexter arrives there at 8:15 A. M., and it takes the hack from Dexter to Bloomfield something like an hour and a quarter to come from Dexter to Bloomfield.    These things were well known to George Houck, who had lived at Bloomfield some twelve or fourteen years.

Court was opened by George Houck a few minutes after eight o'clock on Monday morning.    After sentencing two prisoners to the penitentiary, the special judge turned to the counsel who had been in his office the evening before and asked them if they *had any motions to file*.    They then presented motions to vacate the provisional order appointing Klotz receiver, and for application for a change of venue.    The special judge thereupon ordered the clerk to docket the cause of Merriam and to file the motions, and after stating that he would adjourn court at nine o'clock, took up the motions, waived the reading of the petition on the ground that he had previously read it, heard the motions read, immediately granted them, and then adjourned court till court in course, the whole time consumed not exceeding twenty to thirty minutes, and then immediately left town, as also did counsel for respondents.    That two of those counsel expected Merriam's counsel would be present on the thirteenth is shown by the evidence and by the fact that it was their duty to be present, as the notices to show cause had been served and were returnable on that day.    They

were present a few moments after the court adjourned, as well as the regular judge. George Houck says "*In view of the fact that Mr. Merriam and his attorneys were not there, I took it for granted they had no fight to make,* and disposed of the motion on the law as well as on the facts." He testifies this in the face of his knowledge that counsel for relator could not possibly reach Poplar Bluff that morning before about half past nine o'clock, and in spite of his knowledge that Judge Wear and the attorneys for Klotz and Merriam would soon be there to take up the matter of the receivership, but without waiting to give them an opportunity to arrive, he adjourns court. *That he did so with premeditated design to prevent them from appearing,* is too plain for comment.

I can but regard his action as of the most high-handed and arbitrary character ever witnessed in a court of justice. Whatever his professions may be, this is a case where *actions speak louder than words,* and as every man is presumed to intend the natural consequences of his acts, it must be presumed that he intended to vacate the provisional order and then adjourn the court before the adverse counsel arrived. *Babcock v. Eckler,* 24 N. Y. 632. No other reasonable inference can be drawn from his acts. Nor can it be doubted either that a *tacit understanding* of some sort existed between counsel for defendants and himself, nor that they were *en rapport* with him. These acts *spell f-r-a-u-d,* or they spell nothing. Fraud is rarely susceptible of direct proof; its symptoms and manifestations are chiefly traceable by covered tracks and studious concealments; whatever satisfies the mind and conscience that fraud exists is sufficient. *Massey v. Young,* 73 Mo. 260, and cases cited.

Counsel for defendants who took part in these proceedings justify their action on the score that no

notice was given of Klotz's appointment and that, therefore, such undue advantage can be offset by another; but, whatever may be the rule in *foro conscientiæ*, the plea of *lex talionis* is obviously no answer to the charge contained in relator's reply, that the vacating order was the offspring of fraud.

V. The next question for consideration is whether it is competent to break the force and effect of that order by a collateral attack on it. The reports show two examples of parties to a judgment being permitted to impeach it for fraud. *Hall v. Hamlin*, 2 Watts, 354; *State v. Little*, 1 N. H. 257. But under the code practice, a combination of both law and equity, the circuitous method of resorting to a court of chancery to vacate or annul a judgment because obtained by fraud is no longer in vogue or necessary. *Mandeville v. Reynolds*, 68 N. Y. 528; *Rogers v. Gwinn*, 21 Iowa, 58; *Davis v. Headley*, 22 N. J. Eq. 115; *Dobson v. Pearce*, 12 N. Y. 165; *Ward v. Quinlivin*, 57 Mo. *loc cit.* 427; 2 Freeman on Judgments [4 Ed.], sec. 576, p. 996; 2 Black on Judgments, sec. 973; *Spencer v. Vigneaux*, 20 Cal. 442.

In a work of great research and accuracy, the learned author, treating of the present topic, says: "The line which separates the remedy by setting aside a judgment from that of impeaching it collaterally, *i. e.*, impeaching it without setting it aside, appears to be fading out. It is clear that there is no distinction between two remedies, and there never was any, where the judgment in question is void upon its face, as for want of jurisdiction; and the same rule should prevail in principle, though evidence is required to show that the judgment is void. But it seems that either proceeding may sometimes be proper, though the judgment be not deemed absolutely void, as, where it was rendered in a case of 'meditated and intentional contri-

vance to keep the parties and court in ignorance of the real facts,' the fraud being in this way effectively concealed from notice at the trial. This appears to be an innovation upon what was formerly understood to be the law, to-wit, that, in cases in which the judgment was not void, the remedy, if any remained, was by a direct proceeding to vacate it." Bigelow on Law of Fraud, p. 94.

In *Mandeville v. Reynolds, supra,* FOLGER, J., says: "The court acts upon the matters involved in the action, now, in a double capacity—as a court of law and one of equity. As a court of equity it meets the question of the validity of the judgment, not as one of law, but as of equity, and takes hold of the facts offered to it, not as a collateral attack upon the judgment, but as a direct assault, which, by the changing nature of the issues in the progress of the suit and trial, has become the main question in the case and legitimately before it for trial. It would be quite an abnegation of the conjoint power and jurisdiction of the court, to proceed in the case as long as the issues were of legal cognizance, and as soon as they became of equitable cognizance, to turn the party over to another action in, perchance, the same court, before the same judge, to have, in another trial, that matter proved and decided against the validity of the judgment, which, as the powers of the court are now in constant reciprocal activity, may as well be determined in one trial by the same tribunal. It is not merely that the same judges possess, in equal degrees, powers at law and powers in equity. It is, that the distinction between actions at law and suits in equity, and the forms of such actions, are abolished; and that there is in this state but one form of action for the enforcement or protection of private rights, and the redress of private wrongs (Code, sec. 669). Nor does

it differ that the matter of record brought into question is not a judgment, but an entry upon the docket thereof, or an order in a book in the clerk's office confirmatory of that entry. If, in the changes of the issues in a trial began as one at law, it become necessary for the just disposition of the rights of the litigants to inquire whether that entry or that order is valid, the court is as ready then, and as fully has the jurisdiction then, to investigate and determine as if the trial was laid aside, a new action brought and another trial had, burdened also with the issue of validity. The intent of the code is clear, that all controversies respecting the matter involved in litigation, shall be determined in one action. Whether fraud or imposition in the entry of a judicial matter of record could, before that enactment, have been set up against it collaterally at law or not, it may now be alleged against it as an equitable defense to defeat a recovery upon it."

Under these authorities there can be no doubt that it was admissible to maintain the reply of relator, nor but that the evidence adduced was ample for that purpose.

VI. Should the relator have been permitted to amend his pleading so as to show that the order of Judge Wear was made in vacation? The order in question was signed "John G. Wear, judge," who also filed the order thus signed by him with the clerk. This was evidently done out of abundant caution, in order that the confirming order might be valid whether regarded as made during term or made in vacation. There is no doubt, under our statute and under our rulings, of the power of a judge of the circuit court to appoint a receiver as well in vacation as in term. *Cox v. Volkert*, 86 Mo. 511; *Greeley v. Bank*, 103 Mo. 212; Revised Statutes, 1889, sec. 2193.

Nor is there any doubt under our adjudications and statutory provisions but what the power of amendment is given as largely in *mandamus* cases as in any other civil action whatsoever. *State ex rel. v. Baggott*, 96 Mo. 63; Revised Statutes, 1889, sec. 2116. Hence no difficulty is encountered in permitting the amendment desired, thus showing that the order was made in vacation. Most certainly the evidence affords ample basis for making the amendment; for, whoever heard of a judge of a circuit court *in term time writing out such an order, signing it and then filing it with the clerk?*

And if Judge Wear possessed the *power* to perform the act, to make the order, either - on the bench or at chambers, it is wholly immaterial *what recitals* were made in the order concerning that power. This is exemplified by a number of cases, and denied by none. Thus in *McClure v. McClurg*, 53 Mo. 173, it was held that the false recital that, the certificate of acknowledgment of a sheriff's deed was taken before the *judge* instead of in *open court*, would not vitiate the acknowledgment, and among other reasons given therefor was the fact that the certificate *was not signed by the judge*, as would have been the case had the acknowledgment been *privately taken*, but was signed by the clerk, etc.

In *Chouteau v. Allen*, 70 Mo. 290, there were two statutes, on either one of which certain patents might have been issued, but the order of the county court *recited the wrong* statute; but inasmuch as the order would have been good had the order recited the *right* statute, and as the county court had the *power* to make the order under the *unrecited* statute, it was ruled that the order was, nevertheless, valid.

In *Com'rs v. January*, 94 U. S. 202, a similar ruling was made, where it was ruled that the commissioners having the *power* to issue the bonds it mattered not that they referred to the wrong statute for their authority,

SWAYNE, J., saying: "*Falsa demonstratio non nocet.* The bad here does not hurt the good." Other authorities are cited by counsel for relator, which more or less strongly tend toward the same conclusion.

Whenever instruments of officers or private persons are brought into question, it has *hitherto* been the endeavor of courts in construing them, if it can be reasonably done, so to construe them *ut res magis valeat quam pereat,* and their aim has been to *preserve* and not to *destroy.* They should be *astute,* as Sir Matthew Hale says, to find means to make acts effectual according to the honest intent of the parties. *Roe v. Tranmarr,* Willes, 682; *Kelly v. Calhoun,* 95 U. S. 710.

Guided by these authorities, and for the reasons already stated, it should be ruled that the amendment prayed for could be made; that the order made by Judge Wear on the thirteenth of March, was a valid order, whether regarded as an original or confirmatory order; that the vacating order made by the special judge was void by reason of its fraudulent character and by reason of being granted without notice or opportunty of being heard; that the court of common pleas never acquired any jurisdiction in the premises, and, consequently, that Klotz is the lawful receiver and, as such, entitled to the possession of the litigated property.

VII. The remaining point for determination is whether relator can invoke the remedy of *mandamus.* The authorities show that the remedy by a writ of that name is no longer regarded as *extraordinary,* but owing to its frequent use in modern practice is deemed quite an ordinary writ and remedy. Thus in *Com. v. Dennison,* 24 How. 66, Chief Justice TANEY said: "It is equally well settled, that a *mandamus* in modern practice is nothing more than an action at law between the parties, and is

not now regarded as a prerogative writ. It undoubt-
edly came into use by virtue of the prerogative power
of the English crown, and was subject to regulations
and rules which have long since been disused. But
the right to the writ, and the power to issue it, has ceased
to depend upon any prerogative power, and it is now
regarded as an ordinary process in cases to which it is
applicable.''

In *LaGrange v. State Treasurer*, 24 Mich. 468,.
CAMPBELL, J., said: ''It was urged on the argument
that this writ [*mandamus*] will only lie where there is
a positive statutory duty and an entire absence of any
other remedy. And it is claimed that the decisions
heretofore made sustain this view. We do not know
of any such doctrine, and have never understood it to
have been established in this state, or elsewhere. In
the frequent instances of application for this writ, the
occasion has quite as often been to enforce duties not
imposed by statute, as obligations which were statu-
tory. There may very possibly be found isolated
expressions, which, apart from their context and the
occasion of their utterance, might favor one of the
grounds claimed. Thus, in *People v. Judges of the
Branch Circuit Court*, 1 Doug. (Mich.) 319, it was said:
'There must be no other remedy.' In that case, there
was a better remedy in the ordinary course of law
which reached all that could be desired. But in *People
v. Judge of the Wayne Circuit Court*, 19 Mich. 296, the
doctrine was laid down more guardedly, that a relator
must show 'a clear legal right, and that there is no
other *adequate* remedy.' And in *People v. Ins. Co.*,
19 Mich. 392, it was expressed more fully that the writ
might issue for a specific duty where there is no other
'specific and adequate remedy.' * * * In cases
where the right is clear and specific and public officers
or tribunals refuse to comply with their duty, a writ of

*mandamus* issues for the very purpose, as declared by Lord MANSFIELD, of enforcing specific relief. It is the inadequacy, and not the mere absence, of all other legal remedies, and the danger of a failure of justice without it, that must usually determine the propriety of this writ. Where none but specific relief will do justice, specific relief should be granted if practicable. And where a right is single and specific it usually is practicable."

Subsequently the same court, in discussing the functions of a writ of *mandamus* and referring to the case just cited, said: "As pointed out by the eminent authorities there cited it is, from its very nature, a remedy that cannot be hampered by any narrow or technical bounds. The right, coupled with the necessity of such a vindication of it, supports the jurisdiction and the court in using its discretion, while careful not to use this writ when it is not essential will apply it where it is." *Railroad v. Judge*, 44 Mich. 479.

Touching this writ, Blackstone says: "That it issues to the judges of any inferior court, commanding them to do justice according to the powers of their office, whenever the same is delayed; for it is the peculiar business of the court of king's bench to superintend all other inferior tribunals and therein to enforce the due exercise of those judicial or ministerial powers, with which the crown or legislature has invested them; and this, not only by restraining *their excesses*, but also by quickening their negligence and obviating their denial of justice." 3 Book, 110.

Under the provisions of our constitution, article 6, section 3, giving this court a general superintending control over all inferior courts we have the same power over such courts as was possessed by the court of king's bench at common law. This view was taken in *State ex rel. v. Philips*, 97 Mo. 331, when we held that if the

court of appeals, erring upon a plain point of practice, abused its judicial discretion, and in consequence dismissed an appeal, that this court would issue its *mandamus* to compel the reinstatement of the cause. Similar views are taken of the enlarged functions of the writ of *mandamus* in the states of Michigan, Arkansas, Alabama and Louisiana, which now possess constitutional provisions like our own.

In *Virginia v. Rives*, 100 U. S. 313, where the federal circuit court issued its writ of *habeas corpus* and took from the custody of the state circuit court two prisoners condemned to death, thereupon a writ of *mandamus* was issued by the supreme court of the United States; and upon the ground that the federal court had abused its judicial discretion and exceeded its jurisdiction in issuing the writ of *habeas corpus*, a peremptory *mandamus* issued to that court commanding it to return the prisoners to the state court. Judge STRONG, in disposing of that case and speaking of the remedial functions of the writ of *mandamus*, remarked: "Its use has been very much extended in modern times, and now it may be said to be an established remedy to oblige inferior courts and magistrates to do that justice which they are in duty, and by virtue of their office, bound to do. It does not lie to control judicial discretion, except when that discretion has been abused; but it is a remedy when the case is outside of the exercise of this discretion, and outside the jurisdiction of the court or officer to which or to whom the writ is addressed. One of its peculiar and more common uses is to restrain inferior courts and to keep them within their lawful bounds. Bacon's Abridgment, Mandamus, Letter D; Tapping on Mandamus, 105; 3 Bl. Com. 110. * * * In our judgment, it vindicates the use of a writ of *mandamus* in such a case as the present."

Under these authorities, I make no doubt that

this court possesses full power and authority to compel the Cape Girardeau common pleas court to set aside its order appointing Louis Houck, receiver, on the ground that such order was outside the jurisdiction of that court, besides being an abuse of its judicial discretion for reasons already stated, and for the additional reason that Louis Houck being the chief stockholder in the road was incompetent to be appointed receiver, for that reason alone; and should not have been appointed, unless the urgency of the case demanded it, and *only then upon the consent* of those whose interests were to be entrusted to his charge. *Atkins v. Railroad*, 29 Fed. Rep. 161; Gluck & Becker on Receivers, sec. 29. And it is said that a court ought not to be expected to appoint a person under whose charge and control the resources of the corporation have been exhausted, and the necessity created for a receiver. *Ibid.* And, if necessary, the prayer of the petition could be amended to that effect. *State ex rel. v. Baggott*, 96 Mo. *supra.*

But it would seem that it is not necessary for such a course to be pursued here, for the controversy has been narrowed down to the question as to the prior right of possession of the property as between Klotz and Houck. And at any rate, if I am correct in the position heretofore taken, it is competent for this court in the exercise of its superintending control so to order matters that the property in controversy shall be turned over to the arm of the court which first acquired jurisdiction, and without which turning over, that jurisdiction will be but barren and futile; and this I believe this court can do by that writ of constitutionally comprehensive functions and force known as *mandamus;* for it must be obvious that no appeal lies from an interlocutory order appointing a receiver (High on Receivers, sec. 26); and even if it did, it

would lack a great deal of being "plain, speedy, adequate and specific," and, lacking this, affords grounds for invoking *mandamus*. Merrill on Mandamus, secs. 51, 52, 53, and cases cited.

For these reasons I am of the opinion that the peremptory writ should be awarded.